*Decision will be entered under Rule 50.*

CHICAGO STOCK YARDS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 83797.   Promulgated March 20, 1940.

*Joseph N. Welch, Esq., Edward J. Keelan, Jr., Esq., Lawrence E. Green, Esq., Joseph K. Moyer, Esq.,* and *Francis B. Keeney, Esq.,* for the petitioner.

*Philip M. Clark, Esq.,* and *Stanley B. Pierson, Esq.,* for the respondent.

596

600

604

608

610

**612**

OPINION.

SMITH: The only issue for decision in this case is whether in 1930, 1932, and 1933 the petitioner was taxable under section 104 of the Revenue Acts of 1928 and 1932, that section being identical in both revenue acts.

Section 104 (a) subjects any corporation to a tax equal to 50 percent of its net income, in addition to the tax imposed by section 13, if it "is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to accumulate instead of being divided or distributed." Subdivision (b) provides that "the fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax." Subdivision (d) provides that "the tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year."

In his deficiency notice the respondent held that the petitioner was liable to the tax under section 104, saying:

After a careful consideration of your Federal income tax returns, the protests mentioned above, and all other available information, the Bureau holds that your corporation is subject to taxation under section 104 of the Revenue Acts of 1928 and 1932.

The petitioner in its brief calls attention to the fact that the respondent in his deficiency notice has not determined that the petitioner was either formed or availed of for the interdicted purpose, implying thereby that the Government's case would be stronger if he had made such a categorical determination in his deficiency notice.

We do not think that this is true. The respondent has determined, and has stated in his deficiency notice, that the petitioner is "subject to taxation under section 104 of the Revenue Acts of 1928 and 1929." The only possible factual basis upon which such a determination could rest is that the petitioner was either "formed" or "availed of" or that it was both formed and availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to accumulate instead of being divided or distributed. The necessary implication, we think, carries all the force of a specific determination that such were the facts. The petitioner apparently so understood, for it has adduced a mass of evidence directed towards disproval of those very facts.

In *C. H. Spitzner & Son, Inc.*, 37 B. T. A. 511, and *Mellbank Corporation*, 38 B. T. A. 1108, the respondent sent deficiency notices stating that the taxpayers were "subject to taxation under the provisions of section 104 of the Revenue Act of 1932," without stating or indicating whether such determination was based upon the premise that the taxpayers were "formed" or "availed of" for the prohibited purpose, or that the taxpayers were mere holding or investment companies or that their gains and profits had been permitted to accumulate beyond the reasonable needs of the business. Nevertheless, we proceeded to determine the issue raised in the light of the evidence bearing upon the various factors essential to the respondent's determinations.

We think that the respondent's determination that the petitioner here is subject to tax under section 104 places the burden squarely upon the petitioner of proving that it was neither formed nor availed of for the interdicted purpose.

The petitioner makes the further contention that section 104 of the Revenue Acts of 1928 and 1932 is unconstitutional. This point must be decided against the petitioner's contention, in accordance with *Helvering* v. *National Grocery Co.*, 304 U. S. 282; rehearing denied, 305 U. S. 669.

The petitioner was formed in 1911. It clearly was not formed for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to accumulate instead of being divided or distributed, and the respondent does not so contend.

There remains for consideration only the question whether the petitioner was "availed of" during the taxable years for the interdicted purpose. The petitioner contends that it was not. The question must

be answered in the light of all of the evidence. If the evidence establishes the fact either that the petitioner was a "mere holding or investment company" or that the gains or profits have been "permitted to accumulate beyond the reasonable needs of the business," a prima facie presumption arises of a purpose on the part of the stockholders to escape the surtax.

We consider first the question whether the evidence establishes the fact that the petitioner is a "mere holding or investment company." Petitioner admits that it is a holding company, but denies that it is a "mere" holding or investment company. It submits that it supervises and directs the policies and business operations, other than the daily routine, of all the companies constituting the stockyards enterprise, and acts as banker for them. It further submits that a "mere holding or investment company" is one that holds securities, collects, and possibly invests and reinvests income therefrom, and does nothing more. We think that this definition overemphasizes the importance of the word "mere" in the phrase above quoted. It was apparently the intention of Congress in using the phrase to differentiate a holding or investment company actively engaged in a trade or business from one which has income only from interest and dividends and profits from the sale of securities, and limits its activities to those incident to an ordinary holding or investment company. Cf. *C. H. Spitzner & Son, Inc.*, supra.

In *Rands, Inc.*, 34 B. T. A. 1094, the Board said:

* * * The term "holding company" does not exclude one which actively deals with the funds contributed by its principal and almost sole shareholder, instead of being a passive repository or "holder" of the funds or assets. Cf. *Keck Investment Co.* v. *Commissioner*, supra, R. & L., Inc. v. *Commissioner*, supra. An investment company is not to be defined as one restricted to long term investments for regular income and excluding one which trades in the market and buys and sells speculative stocks or real estate. * * *

In *Reynard Corporation*, 37 B. T. A. 552, the facts were that an individual engaged in the creation of cartoons, whose income therefrom was $1,500 to $2,000 a week, caused a corporation to be organized, to which he transferred the greater part of his property for its capital stock. He became its president and contracted with the corporation to work for it at a salary of $2,500 a month. The corporation, through him as president, entered into a contract for three years with a syndicate for a guaranteed minimum payment of $1,500 a week for the use of cartoons to be created by the president during the three-year period. The activity of the corporation was that of entering into a contract pursuant to which it had a definite and fixed obligation. The Board held, nevertheless, that it was a "mere holding or investment company."

In *R. & L., Inc.*, 33 B. T. A. 857; affd. (C. C. A., 5th Cir.), 84 Fed. (2d) 721; certiorari denied, 299 U. S. 588, the taxpayer contended that it was an operating company, engaged in the management of its properties, conducting a film-booking business, and managing a chain of suburban motion picture theaters. We held that it was a "mere personal holding or investment company."

In *Almours Securities, Inc.*, 35 B. T. A. 61; affd., 91 Fed. (2d) 427; certiorari denied, 302 U. S. 765, the taxpayer invested a portion of its large income in real estate and in the acquisition of shares of stock of a number of banks and of other corporations whose operations it actively supervised, and also operated a concession at Mt. Vernon, Virginia. We held that those activities were inconsequential when the size of the corporation was taken into consideration. Without finding that the corporation was a "mere holding or investment company," we said: "The evidence conclusively shows that the petitioner was primarily a 'holding or investment company.'" In affirming our decision in that case the Circuit Court of Appeals said:

Petitioner's operations were conducted largely through subsidiaries, which were looked after by Mr. du Pont and his brother-in-law, Mr. Ball. After a portion of its cash net earnings was distributed, the remainder was permitted to accumulate beyond the reasonable needs of its business, and reinvested, thereby saving a large amount of income tax which the stockholder would have been obliged to pay for the years in controversy.

In all of its income tax returns for the years 1930 to 1933, inclusive, the petitioner described its business as that of "acquiring and guaranteeing securities." So far as the evidence shows the petitioner guaranteed no securities after the execution of its agreement of October 1, 1914. Since under that agreement it was to receive all of the earnings of the Jersey Co. and its subsidiaries, after the payment of interest and expenses, it guaranteed the payment by the Jersey Co. of interest on the bonds of the Jersey Co. and its subsidiaries, and of dividends of 9 percent upon the stamped certificates of common stock of the Jersey Co. and of 6 percent upon the preferred shares of that company. It did not, however, guarantee the payment of the principal of the bonds above referred to. They were fully secured. The petitioner has never been required to pay out a dollar under its guaranty. During the tax years before us the petitioner collected its income, sold certain securities, made loans to Prince and to the Pau Corporation, wholly owned by Prince, and to the District, and purchased shares of stocks and bonds.

The petitioner's income during the years 1930 to 1933 consisted exclusively of interest, dividends, and profits from the sale of securities. It received no fees for the management and supervision of other corporations. Its office was Prince's office at 1 Court Street,

Boston, Massachusetts. An inspection of its income tax returns shows that it had practically no office expenses. It paid no rent except vault rent. It paid its president a salary of $50,000 per annum, its treasurer a salary of $500 per annum, and "wages" of $2,000 per annum. It paid no other salaries or wages. McDonough was Prince's secretary and was also vice president of the petitioner. He did not, however, receive any salary from the petitioner.

On brief the petitioner submits:

We do not see how the fact that a company had small expenditures is of any real materiality in determining whether or not it is a mere holding company when the only functions claimed for it to bring it out of the category of "mere" is that it supervises and directs the policies and business operations, other than daily routine, of other companies, and finances these companies, acting as sort of a bank for the enterprise. These are functions which require more brain than brawn, so to speak, and do not require any physical expenditure of funds. No large office or office force is needed. As was testified to, the work consisted of mental operations on the part of Mr. Prince and his assistant, Mr. McDonough. * * *

It is true, of course, that Prince supervised the operations of the Jersey Co. and all of its subsidiaries as well as of the subsidiaries of the petitioner. He was enabled to do this through ownership of all the stock of the petitioner, which had virtual control through stock ownership of the other corporations. He was president of the Jersey Co., from which he received an annual salary of $17,500. He was also chairman of the board of directors of the Transit Co., from which he received a like salary, and chairman of the board of directors of the Railway Co., from which he received a salary of $12,499.92. He dictated the policies of the petitioner and of all of the other companies. It does not appear, however, that the petitioner supervised and managed the operations of its subsidiaries and those of the Jersey Co. and its subsidiaries. Prince did this himself. So far as appears, there were no meetings of the board of directors of the petitioner for the determination of any acts to be done by any of the companies. The returns of the Transit Co. and the Railway Co. report Prince as devoting 58 percent of his time to the affairs of the former and 42 percent to the latter. When directing the affairs of those companies Prince was acting as a paid employee of those companies and not of the petitioner.

A corporation which is a mere holding or investment company is subject to the tax imposed by section 104 (a) in the absence of a showing that it was not availed of for the interdicted purpose or that the stockholders included in their individual returns the company's earnings in accordance with section 104 (d). The evidence shows that the stockholders of the petitioner did not return the undistributed earnings and we think that it fails to show that the cor-

poration was not availed of to prevent the imposition of the surtax upon its stockholders.

Section 104 was not leveled solely against holding and investment companies. Any corporation which permits its gains or profits to accumulate beyond the reasonable needs of the business is presumably availed of for the condemned purpose. We next consider the evidence bearing on the accumulation of gains or profits beyond the reasonable needs of the business.

Up to December 31, 1929, the petitioner had accumulated an earned surplus of $19,615,905.69. It had outstanding 5 percent bonds maturing in 1961 of a par value of $3,227,000. It had on hand cash in the amount of $6,689,304.26. It had notes receivable from F. H. Prince, its sole stockholder, in the amount of $3,104,400. Its principal investments consisted of Jersey Co. common shares, $10,993,-551.74; Jersey Co. preferred shares, $45,821.50; and other investments at cost, some of which were not related to the Chicago stockyards enterprise, of $1,467,338.35. The character of some of these investments is shown by an analysis of petitioner's dividend receipts for 1929 as follows:

| | |
|---|---:|
| Chicago Junct. Rys. & Union Stock Yards Co | $200,000.00 |
| Chicago Junct. Rys. & Union Stock Yards Co. common | 247,272.75 |
| Union Stock Yards & Transit Co | 420,702.00 |
| Union Stock Yards & Transit Co. investment account | 128,521.74 |
| Chicago Junction Railway Co | 1,427,500.00 |
| Produce Terminal Co | 200,000.00 |
| Old Colony Trust Associates | 2,000.00 |
| Stock Yards National Bank | 9,760.00 |
| First National Bank of Chicago | 2,413.00 |
| U. S. Cold Storage common | 4,333.50 |
| U. S. Cold Storage preferred | 1,750.00 |
| Central Mfg. District Bank | 4,000.00 |
| Midland Warehouse common | 2,796.00 |
| National Shawmut Bank | 350.25 |
| Westland Oil | 340.00 |
| | 2,651,739.24 |

During the four years 1930 to 1933 the petitioner had a net income of $10,243,373.01. During the same period it paid out in dividends $1,600,000; reduced its liabilities in the amount of $574,298.65; added to its cash on hand $2,755,931.71, $1,800,000 of which was subordinated to the claims of other depositors in a Chicago bank; loaned to the District (Central Manufacturing District), a common law trust beneficially owned by the Jersey Co., $1,625,000 to enable it to pay off some of its bonds and to make improvements to its properties; increased its loans to Prince in the amount of $1,743,600; loaned $236,536.51 to the Pau Corporation (wholly owned by Prince)

upon which no interest was ever received; and spent $1,500,000 in the acquisition of shares of stock of Western Associates, Inc., $245,800.45 for 1,584 shares of common stock and $173,111.83 for 1,905 shares of preferred stock of the Jersey Co., $423,107.25 in the purchase of $609,000 par value of its 5 percent bonds of 1961, and various amounts in the purchase of other securities.

As a holding company, the petitioner had no need for the accumulation of gains and profits. In the ordinary holding or investment company the excess of income over expenses is either paid out in dividends or invested in additional income-producing assets. That is the use which the petitioner made of its excess income. That use can not be regarded within the reasonable needs of the business.

The petitioner contends, however, that it was more than a holding or investment company—that it was engaged in the business of managing the Chicago stockyards enterprise through subsidiary companies in which it owned an interest and that it was necessary for it to finance those companies. It claims that for that purpose it had need of a large surplus.

But even as a management company, we can not see that the petitioner had need for the accumulation of a large surplus. The only expenses connected with the management were the payment of salaries and wages in the amount of $52,500 per year, and the annual income amply provided that revenue.

We do not see either that the petitioner had any need of an accumulation of gains and profits for the purpose of financing other corporations. It was not obligated on the principal of any bonds other than its own which were outstanding at December 31, 1929, in the amount of $3,227,000. It had guaranteed the interest on the bonds of the Jersey Co. and its subsidiaries and dividends on the Jersey Co. common and preferred shares outstanding. But the evidence is to the effect that the petitioner had never been required to pay out a dollar under its guaranty. If it might be assumed that the petitioner needed some accumulation of gains and profits to provide for its guaranty, it should be noted that upon a paid-in capital of $1,000,000 it had accumulated gains and profits up to December 31, 1929, of almost $20,000,000. Certainly there is no indication of the need for any further accumulation in the years 1930, 1932, and 1933.

The evidence shows the manner in which the petitioner has used its earnings from the date of incorporation. It has been free to use them in any manner it saw fit. It has used a large part of them in the purchase of shares of stock of the Jersey Co. The next most important item is loans made to Prince. During the years 1930 to 1933 the petitioner loaned $1,625,000 to District and $236,536.51 to

the Pau Corporation. It had no financial interest in the latter. The necessity for these loans, if any existed, is not shown.

It is the claim of the petitioner that Prince, its principal stockholder, and during most of the years its sole stockholder, contemplated the liquidation of the Jersey Co. upon the expiration of its charter on June 10, 1940; that for such purpose Prince desired to acquire as many shares of Jersey Co. common stock as he could purchase at a reasonable price before 1940; that he was not so much interested in the purchase of preferred stock because that could all be acquired at par upon the liquidation of the Jersey Co. in 1940; that he also desired to accumulate in the treasury of the petitioner sufficient assets to pay off all the bonds of the petitioner and of the Jersey Co. and its subsidiaries by 1940.

The plan as at the close of the year 1929 contemplated an accumulation of cash and liquid assets in the treasury of the petitioner, its subsidiary, produce Terminal, and the Jersey Co. and its subsidiaries of approximately $36,000,000, divided as follows:

| | |
|---|---|
| Total bonded indebtedness | $23,963,000.00 |
| Preferred stock Jersey Co. (64,543 shares) | 6,454,300.00 |
| Common stock Jersey Co. (6,258 shares) | 1,034,134.50 |
| Working capital | 5,000,000.00 |
| Total | 36,451,434.50 |

The bonds and debenture notes of the petitioner and the Jersey Co. and its subsidiaries outstanding on December 31, 1929, were as follows:

| | |
|---|---|
| *Petitioner* | |
| 5% bonds maturing 1961 | $3,227,000 |
| *Jersey Co.* | |
| 5% bonds maturing April 1, 1940 | 10,000,000 |
| 4% bonds maturing April 1, 1940 | 4,000,000 |
| *Transit Co.* | |
| Debenture notes maturing 1930 | 500,000 |
| *Elevated Co.* | |
| 4% bonds maturing March 1, 1945 | 2,327,000 |
| District maturing various dates to 1941 | 3,909,000 |
| Total | 23,963,000 |

We do not think that an accumulation of surplus for the purposes above indicated was within the reasonable needs of the petitioner's business. As above indicated, the petitioner was obligated to pay off only $3,227,000 of the $23,963,000 bonds outstanding at the end of 1929. It had on hand more than twice as much cash as was necessary to redeem those bonds and they did not become due until 1961.

Clearly, there was no reasonable need for the petitioner to acquire the balance of the common stock and the outstanding preferred shares

of the Jersey Co. Amounts spent in the acquisition of those shares simply represented investments by the petitioner. The same also is true of any amounts that it might expend in acquiring the bonds of the Jersey Co. and its subsidiaries.

The bonds of the Jersey Co. and of its subsidiaries were well secured by deposit of collateral. The Jersey Co. had $14,000,000 of bonds outstanding since about 1890. In 1915 $10,000,000 of its bonds matured and were refunded without any assistance from the petitioner. The evidence shows that the real estate of the District has increased greatly in value since purchased. The earnings of the Jersey Co. have likewise increased greatly and that company is assured of the receipt of $2,000,000 annual rental of the Belt Line railway. This lease does not terminate until 2021. Prince testified to the great value of this lease to the New York Central and that he had nothing to fear from a receivership of that company, since the lease was desired by other railroads.

The bonds of the Elevated Co. outstanding in the amount of $2,327,000 appear not to be well secured except through the guaranty by the Jersey Co. But the Jersey Co. is amply able to take care of both its own bonded indebtedness, and that of the Elevated Co.

The petitioner submits that on December 31, 1929, all of the companies constituting what it regards as the Chicago stockyards enterprise had cash and assets readily convertible into cash, without selling any of the shares of stock of the companies of the enterprise of a value of $19,691,666.52. However, that does not take into account the fixed assets of the companies representing the investment in the stockyards, in the railroad, and in other properties. Those assets are income-producing assets of great value. The net consolidated assets of the Jersey Co. and its subsidiaries, as shown by its consolidated return at December 31, 1929, was approximately $40,000,000 in excess of all liabilities and the evidence is to the effect that the book values of some of the assets are much less than their real value. For instance, the book value of $2,500,000 Indiana Harbor Belt Railroad Co. bonds maturing in 1957 and bearing 4 percent interest and guaranteed principal and interest by the Lake Shore & Michigan Southern Railway Co. and the Michigan Central Railroad Co., is only $50,000.

Under his program Prince, through the instrumentality of the petitioner, would own in 1940 all of the assets of the Jersey Co. and its subsidiaries, of a value of more than $60,000,000, free of debt.

In *Keck Investment Co.*, 29 B. T. A. 143; affd. (C. C. A., 9th Cir.), 77 Fed. (2d) 244; certiorari denied, 296 U. S. 633; the taxpayer contended "that it was necessary for it to finance the Superior Oil Co., which had little bank credit, and that if it had not financed that company its investment in it would have been lost by forfeiture of leases." In our opinion we stated that we were not impressed by this argument;

that "The business of the Superior Oil Co., was not the business of this company."

In the proceeding at bar we do not think that the evidence shows a reasonable need of the petitioner for any further accumulation of gains and profits during any of the years 1930, 1932, and 1933.

We have found on the evidence before us (1) that the petitioner is a "mere holding or investment company", and (2) that its gains or profits have been permitted to "accumulate beyond the reasonable needs of the business." The existence of these facts raises the statutory presumption that the corporation was "availed of" for the interdicted purposes, and we think that the evidence has not overcome the presumption.

Even without the benefit of the statutory presumptions, we think there is sufficient evidence in the record to show the existence of the condemned purpose. The bare recital of the undisputed facts relating to the organization of the petitioner, the balance sheets, the source of earnings, the nature of the investments, the large accumulations of cash and surplus, the loans of cash and securities to the petitioner's sole stockholder, and the continued reinvestment of its gains and profits in securities, present, in our opinion, a situation typical of situations which Congress intended to cover by section 104 of the Revenue Acts of 1928 and 1932.

It should be borne in mind that the petitioner was solely owned by Prince from 1922 to June 1, 1932, and, for all practicable purposes, thereafter. The petitioner was the *alter ego* of Prince. It was Prince in corporate clothes. It was of no moment to Prince whether the earnings of the petitioner were carried in his individual pocketbook or in his corporate pocketbook, except that if they had been received in the first instance in his individual pocketbook or distributed to him by the petitioner he would have been subjected to heavy surtaxes upon them, while he avoided such surtaxes by retaining them in the corporation. The situation is analogous to that which obtained in *Helvering* v. *National Grocery Co., supra*, where an operating company organized in 1908 had accumulated a surplus of approximately $8,000,000 and had cash and securities on hand aggregating approximately $4,250,000, which represented four-fifths of the total accumulation of surplus profits during the last ten years. The Supreme Court said:

Since Kohl was the sole owner of the corporation, the business would have been as well protected against unexpected demands for capital, and assured of capital for the purpose of any possible expansion, by his personal ownership of the securities as by the corporation's owning them. * * *

The petitioner was the means by which Prince had succeeded in accumulating up to 1929 a personal fortune of between $15,000,000 and $20,000,000 practically immune from taxation; for the income of the petitioner consisted almost exclusively of dividends received

from domestic corporations which were a legal deduction from its own gross income. The result was that the petitioner had in many years no taxable income, and in other years only a small taxable income.

The evidence shows that the petitioner was availed of by Prince for the purpose of reducing his own tax liabilities. Over a number of years Prince had accumulated more than 17,000 shares of Jersey Co. common stock upon which he was receiving an annual dividend of $9 per share. These were his own shares of stock. The dividends on them were taxable to him. In 1918 he transferred all of those shares of stock to the petitioner at cost and was thereafter relieved from the payment of surtax upon the dividends thereon.

Prince started borrowing money from the petitioner in 1911. The amount of his borrowings increased irregularly from year to year. He was indebted to the corporation at December 31, 1929, in the amount of $3,104,000 and at the end of 1933 in the amount of $4,848,000. The amount of the debt increased in subsequent years. The borrowed funds were used for various purposes. It is true that he paid interest to the petitioner of 4 percent upon the money borrowed, the payment of which interest was deducted from his gross income in his individual tax returns. He also borrowed securities of large value from the petitioner, which he used as collateral to obtain loans at banks.

There is no satisfactory explanation of why the petitioner did not make a dividend distribution to Prince of the funds which he needed.

In the case of *Helvering* v. *National Grocery Co.*, *supra*, the Supreme Court said:

> * * * As was stated in *United Business Corporation* v. *Commissioner*, *supra*, 62 F. 2d page 755: "These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise."

To the same effect see *William C. deMille Productions, Inc.*, 30 B. T. A. 826, and *Mead Corporation*, 38 B. T. A. 687.

It furthermore appears that in 1931, 1932, and 1933 Prince sold securities to the petitioner for $120,193.21, $138,108.35, and $59,664, respectively, which enabled him to deduct from gross income in his income tax returns for those years losses of $196,124.68, $221,629.08, and $93,102.22, respectively, and in 1932 the petitioner sold to F. H. Prince & Co., Inc., which was organized by Prince on June 1, 1932, shares of the capital stock of the Stock Yards National Bank and of the Central Manufacturing District Bank, which enabled the petitioner to claim a deductible loss of $221,202.03. The shifting of these securities from Prince to the petitioner and from the petitioner to Prince really meant no economic loss to Prince and the

investment by the corporation of the amounts of money spent in acquiring the securities from Prince was not in furtherance of the program which Prince claims to have had for the corporation.

It is agreed that if all of the net income of the petitioner for the taxable years 1930, 1932, and 1933 had been paid out as dividends the additional surtaxes payable by Prince would have amounted to $572,234.91 for 1930; $386,582.23 for 1932; and $377,706.61 for 1933, or a total for the three years of $1,336,523.85. This does not take into account any tax liabilities which might have been incurred by the other stockholder after January 1, 1932, or the tax which would have been payable by the F. H. Prince Trust if it had received and passed on the dividends. By the failure of the petitioner to distribute its profits during the three years before us Prince has avoided the payment of surtaxes in the amount of at least $1,336,523.85.

Section 104 (d) of the Revenue Acts of 1928 and 1932 provides a means by which a holding or investment company which accumulates its gains or profits beyond the reasonable needs of the business may avoid the payment of the tax imposed by section 104 (a). Subdivision (d) provides that the tax shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year. It has been stipulated in this proceeding that the stockholders of the petitioner did not so report the earnings of the petitioner during the years before us.

Although Prince testified that under his program it was contemplated that the Jersey Co. would be liquidated in 1940, there appears to be no necessity for its liquidation and many reasons why it probably will not be liquidated. When the petitioner was organized in 1911, an issue of $14,000,000 bonds was provided for. The petitioner covenanted with the trustee that it would do all that was necessary for it to do to continue the existence of the Jersey Co. The outstanding bonds of the petitioner are callable at 105, but if they are not called and paid off the petitioner is under obligation to continue the existence of the Jersey Co.

McDonough, petitioner's vice president, testified that either he or Prince had consulted counsel as to the possibility of obtaining an extension or renewal of the Jersey Co.'s charter. Counsel advised that such an extension or renewal could undoubtedly be obtained under the New Jersey statutes. They simply require a consent of two-thirds of each class of stock of the old corporation. It is inconceivable that the petitioner can not obtain such a consent. It owns more than two-thirds of the common shares, and the preferred shares bearing a 6 percent dividend are well secured by assets and earnings.

Upon a liquidation of the Jersey Co. in 1940 the petitioner would apparently be subject to heavy income taxes; for its investment in the common and preferred shares and in the bonds of the Jersey Co. and its subsidiaries would amount to not more than $35,000,000 and the assets acquired would apparently have a value, based upon cost, book values, and earnings, of more than $60,000,000. Although it may be desirable to merge or consolidate the petitioner and the Jersey Co., it seems doubtful whether the Jersey Co. will be liquidated in 1940.

In its brief petitioner calls attention to our opinion in· *Mellbank Corporation, supra*. It states that its situation is in no great respect different from the situation which existed in that case and that, since we reached a conclusion that the taxpayer was not subject to tax under section 104, the same conclusion is warranted here.

Each case involving the application of section 104 must be decided upon its own facts. In the *Mellbank* case the Board said in its opinion:

\* \* \* Obviously, petitioner was not a mere holding or investment company. It had no investments in, and was not holding any corporate stocks, other than stocks of its member banks, which was necessary to enable it to carry on its business of managing, supervising, and operating those banks. \* \* \*

The only year before us was 1932. The taxpayer had no taxable income for that year, after the deduction of dividends received upon certain shares of stock. Its net accumulation of gains and profits for the taxable year was only $98,444.32. We held upon the evidence as a whole that the corporation had not been availed of for the interdicted purpose stated in section 104 of the Revenue Act of 1932.

In our opinion the evidence in the proceeding at bar establishes that the petitioner is a mere holding or investment company; that its gains and profits were permitted to accumulate beyond the reasonable needs of the business; that the petitioner had no reasonable need to add to the earned surplus on hand at December 31, 1929, any part of the gains and profits of the years 1930, 1932, and 1933; and that it fails to show that such accumulation was not for the purpose of preventing the imposition of the surtax upon its shareholders.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

STERNHAGEN, dissenting: In my opinion, the evidence requires a finding that the petitioner was not availed of for the purpose of enabling its shareholder to escape surtax. The accumulation of earnings and profits was not for the purpose of reducing or preventing taxes but for the purpose of meeting the forthcoming demands occasioned by the termination of the Jersey Co.'s charter in 1940.

This positive business purpose appears not alone from the testimony of Prince, but also from the testimony of others who have been intimately associated with the business for many years. These witnesses were entitled to belief and their testimony is credible and in no respect impugned or otherwise weakened either by cross-examination or countervailing testimony.

Throughout the existence of the corporation since 1911, the dominant objective has been to accumulate a surplus with which to acquire all of the Jersey Co.'s common and preferred shares by 1940 and liquidate its indebtedness and the outstanding indebtednesses of other companies which the liquidation would entail. There is no reason why the Board should be incredulous of the several statements of that continuous purpose. It would be reasonable to infer such a purpose even if there were no direct testimony that it existed. Furthermore, opinion witnesses for both the petitioner and the Government all testified that such a purpose would be reasonable. The only witnesses for the Government were three analysts who, after a study of the history and the probable future, agreed that the liquidation of the Jersey Co. in 1940 was a desirable objective and that it would not be unreasonable to build up a fund to provide for it.

Despite this evidence, however, the Board holds from the circumstances that it will not be necessary to liquidate the Jersey Co. or the several indebtednesses which will then and soon thereafter become due, and concludes that the accumulation for that purpose is unnecessary and unreasonable. Upon these rationalized postulates, the Board, contrary to the only direct evidence in the record, holds that there was a purpose to prevent the imposition of the surtax upon the shareholder. Thus the single ultimate finding of fact upon which the imposition of the additional tax is expressly required by the statute to be conditioned is built up from circumstances many of which are beside the point of the statute. The purpose which the Board finds to exist is not an actual purpose but is a sort of constructive purpose, as if from the circumstances one must inevitably conclude that the conduct of the corporation and its officers could not reasonably have occurred unless the tax-saving purpose existed. Section 104, however, clearly requires the actual existence of the tax-saving purpose to support the 50 percent additional tax; and where the taxpayer by a fair preponderance of the evidence establishes that the purpose did not in fact exist, there is no justification for fabricating it by construction.

The corporation began its life as a vehicle to facilitate the reorganization which would be required in 1940. This is not questioned. Never throughout its history has there been a departure from this plan. It began in 1911 before there was any substantial corporation tax, before there was any constitutional power to impose an income

tax, and many years before there was any thought of an individual surtax. There has been a uniform policy since 1923 to distribute a dividend of 5 percent on the capital stock and accumulate the remaining earnings. There was no change in this policy in 1930 to denote a tax-saving purpose. This plan persisted without question throughout the years after the 1918 Act, when there was first imposed an additional tax upon the corporation by reason of the nondistribution of earnings.

During all the years since such a tax was first enacted it has been predicated on the purpose to prevent shareholders' surtax. Always this factor has been known to be a difficult one for the Government and a serious impediment to the collection of such taxes. Purpose has always been recognized as something hard for the Government to prove and easy for the taxpayer to disprove. Yet the tax with this condition was deliberately reenacted time and time again. It still exists in section 102 of the 1938 Act.[1] Not until the enactment, after vigorous legislative debate, of the Revenue Act of 1934 was a tax imposed on undistributed net income irrespective of purpose. This was in the personal holding company tax of Title I A. It was new and prospective legislation. Later, in section 14 of the 1936 Act, the undistributed profits tax was added. It is improper, therefore, for the Board, in 1940, to apply the 1928 and 1932 statutes as if they imposed the high additional tax upon all the corporation's net income although it had no purpose of preventing surtax on its shareholders. This is in effect to apply the later type of tax retroactively to a period when it was expressly and knowingly rejected by Congress. It is treating the language of the controlling statute as if it were a mere figure of speech.

If I understand the Board correctly, they say that the accumulation of $19,615,905.69 by December 31, 1929, was enough for the forthcoming needs of 1940, and that the profits added in 1930, 1932, and 1933 were therefore beyond the reasonable needs of the business and *ergo* only explicable as a means of tax avoidance for the shareholder. No doubt the Board has the power and the duty to determine whether gains or profits have been permitted to accumulate beyond the reasonable needs of the business; but the determination should be more than a substitution of the Board's judgment for that of the managers of the business—particularly when the Commissioner has made no determination on the subject. For myself, I am unable to draw a line at December 31, 1929, between the limit of reasonable accumulation and additions to it, label the latter as excessive and unreason-

---

[1] Section 102 of the 1938 Act still fixes purpose as a necessary condition of the tax but the presumption that an unreasonable accumulation evidences the disapproved purpose is made more difficult to overcome since the taxpayer must prove its absence of purpose by a clear preponderance of the evidence and not merely by enough evidence to overcome a prima facie case.

able, and, so labeled, regard the additions in the taxable years as a manifestation of the disapproved purpose.

To point to the fact that Prince began his stockyards venture with a comparatively small investment which has grown into a large fortune, and that in the intervening years his personal taxes and those of the petitioner have been relatively small, is to disclose a type of reasoning which, in my opinion, should have no place in tax adjudication. Nothing in the record discloses any actual or attempted escape from taxes imposed by law. This drastic additional tax can not be justified for the years in question by pointing to the extent to which the taxpayer and its shareholder have paid less than it is thought, by some nonlegal yardstick, that they should have paid. The tax, to be sure, was intended as a penalty; but that is the more reason why it should be applied with a careful regard for its terms and not sentimentally.

The loans which petitioner made to Prince were consistently used by him and his brokerage firm to buy the securities of stockyards corporations. Only once does it appear that he used any of the borrowed funds for a private purpose. This was in 1932, when he used $160,000 for a short period to finance the construction of his Newport house until he could sell his North Shore place. The securities which petitioner loaned to Prince were used by him as collateral to secure loans from banks for the purchase of stockyards securities, and the cash which petitioner loaned to Prince was used for the purchase of similar securities. Prince paid interest to the petitioner at the going rate on the cash loans and the petitioner received the income upon the securities which it loaned to Prince for purposes of collateral. In view of the evidence that the loans were made to Prince because as a broker he was in good position to buy stockyards securities whenever they were available, and that this was, throughout the entire history of the company, an incident to its general plan, it is misleading to find, as the Board does, that "the loans were used by Prince for any purpose desired by him." There is a clear distinction between these loans to Prince in carrying out the petitioner's business plan and the loans to the president in *Helvering* v. *National Grocery Co.*, 304 U. S. 282. In that case the loans were used by the corporate officer to invest in wholly unrelated securities for a profit, just as they might have been used by him if they had been distributed to him in dividends. The amounts loaned to Prince during the taxable years did not serve the purpose of disguised dividends. In 1930 the loans actually decreased by $916,250. Over the four years, 1930–1933, the net amount loaned to Prince was $886,070. Included in this net was the loan in 1933 of $1,000,000 which Prince used in the purchase, for $1,067,000, of the Armour shares. This purchase was made to acquire control of the

Armour stock so that the profitable Armour business would be kept in the stockyards enterprise. I think, therefore, that when the circumstances of all the loans by petitioner to Prince are given consideration they lose force as indicating any purpose to enable him to have the personal use of petitioner's earnings and yet escape surtax.

It is said that Prince sold securities to the petitioner at a loss, which gave him a personal income tax deduction, and the petitioner took similar loss deductions on sales to Prince. Aside from the fact that the amounts were comparatively too small to be indicative of a purpose under section 104, the decision in *W. S. Farish & Co.*, 38 B. T. A. 150; affd., 104 Fed. (2d) 833, establishes that this has no place under that section. Such transactions in themselves have no significance in determining whether the corporation was availed of to prevent surtax on the shareholder "through the medium of permitting its gains or profits to accumulate instead of being divided or distributed."

I am, therefore, of opinion that the reasoning of the Board in reaching its conclusion is unsound. The taxpayer has shown affirmatively an absence of actual purpose to prevent the imposition of surtax upon its shareholder, and, since this is the crux of the case, the determination of the Commissioner that the case is one under section 104 should be reversed and the resulting deficiency set aside.

MURDOCK, LEECH, and KERN agree with this dissent.