California Motor Transport Co., Ltd., a Corporation v. Commissioner. California Motor Express, Ltd., a Corporation v. Commissioner.
Cal. Motor Transp. Co. v. Comm'r
Docket Nos. 108467, 111613, 108468, 111612. United States Tax Court
1943 Tax Ct. Memo LEXIS 345; 1 T.C.M. (CCH) 974; T.C.M. (RIA) 43192; April 23, 1943
*345 Norman A. Eisner, Esq., 1074 Mills Bldg., San Francisco, Calif., and George J. Kasch, C.P.A., 1715 Russ Bldg., San Francisco, Calif., for the petitioner. Frank T. Horner, Esq., and Henry M. Sorrell, C.P.A., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined that each petitioner, during the calendar years 1939 and 1940, had permitted its earnings, profits, or surplus to accumulate beyond the reasonable needs of its business and that it had been availed of for the purpose of preventing the imposition of surtax upon its stockholders. He therefore held that each was subject to the surtax prescribed by section 102 of the Internal Revenue Code and accordingly determined deficiencies in the following amounts: 1939
1940
California Motor Transport
Co
$ 8,892.25
$8,634.22
California Express Co
10,035.66
4,466.94
The two corporations were organized at the same time and have been closely related in operation and ownership. Stated generally, the Transport Co. has been engaged in hauling freight, by motor truck and trailer, between the cities of Southern California and those in the vicinity of San Francisco Bay. The *346 Express Co. has been engaged in performing all other services in connection with the transportation of the freight, including the maintenance of the terminals, picking up and delivering the merchandise to the carriers, and billing and collecting the cost from the shippers. The proceedings of the Transport Co. were consolidated for hearing and at the conclusion thereof those of the Express Co. were consolidated for hearing. It was stipulated that all evidence in the group first heard, pertinent to the issue in the second group, should also be considered. Separate findings of fact will be made; but the applicable legal principles may be discussed in one opinion. Findings of Fact Transport Co. The californiaMotor Transport Co., Ltd., hereinafter referred to as petitioner or the Transport Co., is a California corporation with its principal office at 625 Brannan Street, San Francisco, California. It filed its income tax returns, for the periods here involved, with the collector of internal revenue for the northern district of California. Petitioner was incorporated in May, 1930, with broad powers to conduct a motor transport business. Thereafter and during the taxable years *347 it was engaged in the transportation of merchandise for the California Motor Express, Ltd. Its activities consisted principally of transporting merchandise by fast over-night freight service between Los Angeles, San Francisco and Oakland. Although it was authorized by its charter to transport passengers it never did so. Petitioner's authorized capital stock was 2,500 shares of no par value. Its original directors were H. E. Shearer, Douglas Brookman and E. Sundberg, each of whom subscribed to one share of stock. At the time of its organization petitioner acquired the transportation business of E. Sundberg, operating between Los Angeles and San Francisco and the Day cities, in exchange for 247 shares of its capital stock. Of the stock held by Sundberg 247 shares were transferred to Elizabeth Coughlin, mother of James C. Coughlin, on December 16, 1930. One share was transferred by Sundberg to James C. Coughlin on September 8, 1931. The share issued to Shearer was transferred to James C. Coughlin on June 16, 1930. Elizabeth Coughlin died intestate in 1937, and left surviving eight children, one of whom is James C. Coughlin. Her estate was still in process of administration at the time *348 of the hearing. The 247 shares of petitioner's stock, owned by her at the time of her death, were a part of her estate during the taxable years. Petitioner operated under a franchise from the State of California. Its original invested capital was $36,295.58. All additional capital has been supplied from its earnings and in this way it has increased the amount of its equipment since its organization. No outside capital has been introduced. The equipment acquired by petitioner from Sundberg consisted of six tractors and semi-trailers. A tractor and trailer, which collectively constitute a motor unit, cost between $14,000 and $15,000. Depreciation on such equipment is computed on a basis of a useful life of 450,000 miles. Petitioner's annual use of a unit is from 110,000 to 120,000 miles. Petitioners' operating equipment in 1930 had a value of $36,200.40. This was increased each year as its business developed. As of December 31, 1939, 1940 and 1941 it was as follows: 1939
1940
1941
Operating equipment
$179,330.99
$186,375.09
$312,832.43
Depreciation reserve
112,122.08
123,250.71
127,164.31
Net value
$ 67,208.91
$ 63,124.38
$185,668.12
Petitioner's gross earnings, *349 net profits, Federal income tax paid and net profits less tax, from 1936 to 1941, were as follows: Gross
Net
Federal Income
Net Profits
Year
Income
Profits
Tax Paid
After Tax
1936
$231,094.21
$35,068.55
$ 5,647.41
$29,421.14
1937
304,207.05
24,252.23
2,999.95
21,252.28
1938
308,521.94
27,604.64
4,358.48
23,246.16
1939
382,732.29
43,912.35
8,343.36
35,568.99
1940
342,655.27
45,692.20
10,966.13
34,726.07
1941
651,510.24
54,890.76
18,680.65
36,201.11
Petitioner's balance sheets as of December 31, 1939, 1940 and 1941 were as follows: ASSETS
1939
1940
1941
Cash on hand and in Banks
$ 10,481.70
$ 35,078.49
$ 27,682.94
Notes and Accounts Receivable
100,786.81
139,083.10
28,914.13
Loans to James C. Coughlin
12,786.10
Carrier's operating Properties
179,330.99
186,375.09
312,832.43
Prepaid Expenses
2,772.48
3,373.51
18,375.76
Guarantee Deposits
TOTAL ASSETS
$306,158.08
$363,910.19
$387,805.26
LIABILITIES, RESERVES AND NET WORTH LIABILITIES
Accounts Payable
$ 20,806.60
$ 27,649.61
$ 40,190.04
Accrued Taxes and Wages Payable
8,748.66
13,699.91
28,717.87
Notes Payable (for Dividends)
37,000.00
37,000.00
TOTAL LIABILITIES
$ 66,555.26
$ 78,349.52
$ 68,907.91
RESERVE FOR DEPRECIATION
112,122.08
123,250.71
127,164.31
TOTAL LIABILITIES AND RESERVE
$178,677.34
$201,600.23
$196,072.22
NET WORTH
Capital Stock (No Par Value Common 32,627.50
32,627.50
32,627.50
Stock)
Surplus (Contributed)
3,714.65
3,714.65
3,714.65
Surplus (Earned)
91,138.59
125,967.81
155,390.89
$306,158.08
$363,910.19
$367,805.26
*350 The equipment owned by petitioner has not been sufficient to meet its business needs and ever since its organization it has been obliged to lease additional equipment. The equipment leased by it during the years preceding the taxable years ranged from 100 to 150 units of equipment annually. In 1940 it leased approximately 200 units at a cost of $20,000. In 1939, due to unusual conditions, it leased approximately 400 units (round trip) at a cost of more than $40,000. In case of leased equipment petitioner paid the driver's salary, the Federal and state unemployment insurance and workman's compensation insurance. It was more satisfactory for petitioner to use its own equipment, which had a capacity ranging from 17 to 20 tons per unit, while the capacity of leased equipment was sometimes as low as 5 tons. Petitioner's drivers on the whole were better and more reliable than those operating the leased equipment and its equipment was generally in better repair than the leased equipment enabling fast movement with minimum risk of breakdown while in transit. Its policy has always been to own as much of its own equipment as possible; but its earnings have not been sufficient to enable it *351 to procure all of the equipment necessary in its business. Due to exorbitant rates for collision insurance the petitioner carriers its own collision insurance and maintains its own repair shops. It has never set up any reserve to take care of this liability. Petitioner pursued a fairly consistent policy of business expansion. In 1938 it purchased the Redline Transfer Company and its equipment for $24,000. In 1939 petitioner had an opportunity to purchase the Valley and Coast Transit Company, The Coast Line Express and The Sunset Transfer Company. Contract for the purchase of these companies was made in the name of J. C. Coughlin, acting for petitioner. This was deemed to be advisable in the absence of any prior authorization by the regulatory bodies of the state for petitioner to acquire the rights and properties of these companies. Coughlin's negotiations and contracts were approved by petitioner's board of directors. Coughlin advanced $52,000 on account of the purchase price of $87,500. The money advanced by Coughlin has not been repaid to him by petitioner. Of the total agreed purchase price, $30,000 was to be paid by petitioner for the operating rights and equipment and $57,500 *352 by the California Motor Express Co. for terminals. In 1939 petitioner expended $16,168.02 for equipment; in 1940 it expended $7,044.10 and in 1941 it expended $126,457.34. These purchases were for cash In 1941 it purchased eight new units. During 1937 petitioner loaned James C. Coughlin $12,786.10. This was repaid by him in 1939. In 1936 and 1937 petitioner declared dividends totaling $37,000. It was not in a position to pay the dividends in cash and the distribution was made in its promissory notes, which were carried until 1941. The earnings or profits of petitioner, during the taxable years, were not permitted to accumulate beyond the reasonable needs of its business, nor was petitioner, during either year, availed of for the purpose of preventing the imposition of surtax upon its stockholders. Express Co.
The California Motor Express Co., hereinafter referred to as petitioner or the Express Co., is a California corporation with its principal office at 625 Brannan Street, San Francisco, California. It filed its income tax returns, for the periods here involved, with the collector of internal revenue for the northern district of California. Petitioner was incorporated *353 in May, 1930, for the purpose of conducting a motor express business for the carriage of merchandise. In the conduct of its business petitioner contacts the shippers, picks up and delivers the merchandise, makes collections, engages and pays the carriers, owns and maintains terminals and performs all the services incident to its business except the actual transportation of the merchandise. The merchandise is transported by the California Motor Transport Co., Ltd. Since petitioner handles considerable merchandise in through traffic, some forty or fifty other public carriers are engaged by it as connecting carriers. Petitioner does not own or operate any transportation equipment. The original capital of petitioner was $11,595.48. It has developed exclusively through putting its earnings back into the business and no outside capital has ever been put into it. Petitioner has not invested any of its earnings in stocks, bonds, or other outside investments. Since 1932 the majority of petitioner's stock has been owned by James C. Coughlin. In 1938 Coughlin owned all the stock. On December 22, 1939, there was a transfer from surplus to capital and a stock dividend of 300 shares. Since that *354 date the stock has stood 348 shares in the name of James C. Coughlin and one share each in the names of Douglas Brookman and Rose Coughlin Morton. It is necessary for petitioner to have terminals for the purpose of receiving and delivering merchandise, for its pick-up service and as offices for billing, accounting and soliciting traffic. It has been the aim and purpose of petitioner to own its terminals. In 1941 it acquired land in Los Angeles for the erection of terminal buildings; but construction of the building, which was to cost approximately $75,000, was held up due to war time restrictions. It is contemplated that this building will be erected as soon as the restrictions are removed. In April, 1941, petitioner acquired the premises at 625 Brannan Street, San Francisco, at a cost of $45,000. Between April 30, 1941, and October 16, 1942, it expended $147,911.98 for terminal property in Oakland, Los Angeles and San Francisco. It also plans to erect or acquire terminals in Bakersfield, Fresno and San Luis Obispo, all in California. In 1939, Coughlin, acting for petitioner and the Transport Co. contracted with E. L. McConnell for the purchase of the Valley and Coast Transit Company, *355 the Coast Line Express and the Sunset Transfer Company. The purchase price was $87,500. Of this amount $57,500 was to be paid by petitioner for terminals. Coughlin advanced $52,000 on the purchase price which has not been repaid to him. Petitioner carries insurance on the merchandise being handled by it up to $40,000, which is the maximum obtainable on any one shipment. The value of the merchandise carried in one shipment sometimes exceeds $100,000. No reserve has been set up by petitioner to take care of the excess liability; but as to it petitioner is, in effect, a self-insurer. Petitioner loaned Coughlin $18,011.71 in 1938 which was repaid by him, with interest, in 1939. In 1940 Coughlin borrowed $70,000, of which $60,000 was repaid, with interest, in 1941. This money was borrowed and used by Coughlin for the benefit of petitioner and the Transport Co. A portion of it was used to make payment on the McConnell contract for the purchase of additional terminal facilities and a portion of it was used in the purchase of the Redline Transfer Company, a pick-up and delivery service. Shippers often called upon petitioner for financial statements before using its services. It was therefore *356 quite desirable that it be, at all times, in an obviously solvent condition. During the harbor strike in 1939 freight had to be diverted from San Francisco to Los Angeles. Much of the traffic came in with charges to be collected from the consignee. The steamship companies required any carrier handling such traffic to pay all of their charges before the shipments were released. The petitioner paid out in excess of $55,000 for the account of the consignees to move that traffic. Petitioner also handled C.O.D. shipments in excess of $281,000 during 1939 and similar shipments in excess of $330,000 were also handled during 1940 and 1941. In many cases petitioner had to settle daily with connecting carriers. Petitioner's gross earned revenues, net profits, Federal income taxes paid and net profits for the years 1938 to 1941, inclusive, were as follows: Gross
Net
Federal Income
Net Profits
Year
Income
Profits
Tax Paid
After Tax
1938
$515,002.80
$35,607.90
$ 6,765.50
$28,842.40
1939
714,859.09
49,558.83
9,416.18
40,142.65
1940
684,806.67
21,872.48
3,567.65
18,304.83
1941
536,791.67
70,092.78
21,478.76
48,614.02
Petitioner's balance sheets as of December *357 31, 1939, 1940 and 1941 are as follows: ASSETS
1939
1940
1941
Cash On Hand and In Banks
$122,742.22
$177,294.04
$107,371.56
Notes and Accounts Receivable
159,223.01
48,869.27
93,723.58
Loans to J. C. Coughlin
70,000.00
10,000.00
Deferred Charges to Operations
2,603.41
4,321.97
1,170.55
Furniture and Fixtures
4,879.56
6,234.81
12,167.67
Terminal Land and Buildings
93,780.38
TOTAL ASSETS
$289,448.20
$306,720.09
$318,213.74
LIABILITIES, RESERVES AND NET WORTH
Accounts Payable
173,093.82
177,235.39
117,291.29
Accrued Wages and Taxes Payable
1,941.74
2,681.91
1,296.32
TOTAL LIABILITIES
$175,035.56
$179,917.30
$118,587.61
RESERVE FOR DEPRECIATION
2,286.88
2,923.92
9,622.13
TOTAL LIABILITIES AND RESERVE
$177,322.44
$182,841.22
$128,209.74
NET WORTH
Common Stock (No Par Value)
60,900.00
60,900.00
60,900.00
Surplus (Contributed)
2,895.48
2,895.48
2,895.48
Surplus (Earned)
48,330.28
60,083.39
126,208.52
$289,448.20
$306,720.09
$318,213.74
During the taxable years petitioner did not own its terminals. At December 31, 1941, it owned terminal land and buildings in the aggregate amount of $93,780.38. The earnings *358 or profits of petitioner, during the taxable years, were not permitted to accumulate beyond the reasonable needs of its business, nor was petitioner, during either year, availed of for the purpose of preventing the imposition of surtax upon its stockholders. Opinion The applicable provision of the Internal Revenue Code (section 102) is shown in the margin.[1] The question is primarily one of fact, to be decided from a consideration of all the evidence. Respondent's determination is presumptively correct. Trico Products Corporation, 46 B.T.A. 346, 373; The Stanton Corporation, 44 B.T.A. 56 (both on appeal 2 C.C.A. [2]). *359 The issue is the narow one - Was either petitioner availed of during the taxable years for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed? It has been decided in favor of each petitioner. Some of the reasons will be alluded to briefly. Petitioners were organized for business purposes. Their articles of incorporation are couched in the same language, each having the power to "own, control, operate and conduct, a general drayage, express, transfer, trucking, forwarding, and/ or warehouse business." One was owned almost exclusively by James C. Coughlin and the other by his mother. The activities, which they were authorized to carry on, were conducted more or less jointly rather than competitively, one, as its name indicates, being primarily engaged in the transportation business and the other in the complementary business of assembling the merchandise for shipment and dealing with the shippers. Both were reasonably successful and their problems were somewhat akin - each had a growing need for capital as its business expanded. The common problem was *360 solved in the same fashion, i.e., a substantial portion of the earnings was "plowed back into" the business and each pursued the general policy of holding dividends down to the end that accumulations might be made for the purchase of needed additional equipment and facilities. Respondent correctly points out that adjusted cases suggest many elements to be taken into consideration in attempting to determine the presence or absence of the purpose interdicted by the statute. Those he enumerates are: (1) factual background; (2) balance sheets; (3) source of earnings; (4) nature of investments; (5) accumulation of surplus; (6) niggardly payment of dividends; (7) loaning of cash to stockholders; and (8) retention of large balances. Cases applying or discussing some of these principles (which are overlapping) are legion. Some of them are: United Business Corporation of America, 19 B.T.A. 809, affd., 62 Fed. (2) 754, certiorari denied 290 U.S. 635; idem 33 B.T.A. 83 (reversed on stipulation of the parties); Keck Investment Co., 29 B.T.A. 143, *361 affd., 77 Fed. (2d) 244, certiorari denied 296 U.S. 633; William C. DeMille Productions, Inc., 30 B.T.A. 826; Cecil B. DeMille, 31 B.T.A. 1161, affd., 90 Fed. (2) 12, certiorari denied 302 U.S. 713; Fisher & Fisher, Inc., 32 B.T.A. 211, affd., 84 Fed. (2) 996; A. D. Saenger, Inc., 33 B.T.A. 135, affd., 84 Fed. (2d) 23, certiorari denied 299 U.S. 577; R. & L., Inc., 33 B.T.A. 857, affd., 84 Fed. (2d) 721, certiorari denied 299 U.S. 588; Almours Securities, Inc., 35 B.T.A. 61, affd., 91 Fed. (2d) 427, certiorari denied 302 U.S. 765, rehearing denied 303 U.S. 666; Helvering v. National Grocery Co., 304 U.S. 282, affirming 35 B.T.A. 163; *362 R. L. Blaffer & Co., 37 B.T.A. 851, affd., 103 Fed. (2d) 487, certiorari denied 308 U.S. 576, rehearing denied 308 U.S. 635; J. M. Perry & Co., Inc. v. Commissioner, 120 Fed. (2d) 123; United Block Co., Inc. v. Commissioner, 123 Fed. (2d) 704, certiorari denied 315 U.S. 812; and Chicago Stock Yards Co., 41 B.T.A. 590, affirmed Helvering v. Chicago Stock Yards Co., 318 U.S. 693. No useful purpose would be served by summarizing the facts in the cited cases or attempting to reduce them to categorical principles. On the whole respondent's analysis of them upon brief is correct. But fact cases cannot well be decided by analogy. Corporations and their problems are as divergent as personalities; and slight shades of difference may serve to tip the scales one way or the other. It has been stated many times that the answer to the question of what are reasonable and unreasonable needs of a business "is rarely easy to find;" and *363 where a taxpayer is engaged in a business which is "obviously hazardous from a business standpoint" we should well "hesitate before substituting our judgment upon the reasonableness of the corporate accumulations for that of the directors." Dill Manufacturing Co., 39 B.T.A. 1023, 1031. We do not suggest that our responsibility to decide the present controversy can be shirked but merely point out that our task, as the triers of the facts, is a difficult one. Examining briefly the findings in the proceedings involving the Transport Co. it is noted that the business was growing by leaps and bounds. The need for additional equipment was progressively becoming greater, as is indicated by the fact that during each of the two years units were leased for more than 200 round trips at a cost of approximately $20,000, increasing, under the unusual conditions prevailing during the harbor strike of 1939, to 400 round trips. The need for additional equipment was in the minds of petitioner's directors and all testified that the accumulations were made for the purpose of purchasing it. In addition, the officers had tentatively obligated the corporation to purchase *364 competing companies and to pay $30,000 for the rights and equipment to be secured from them as soon as the details surrounding the securing of the necessary authorization from the state authorities could be worked out. The corporation was a selfinsurer against collision and other highway hazards; and with a fleet of trucks of the size owned by it there was always the possibility it might be required to pay out very substantial sums. It might have been a sound accounting practice for it to set aside a portion of the surplus into a contingent reserve fund; but as to this we need express no opinion. Its net liquid assets were only $60,271.83 at the end of 1939 and $99,185.55 at the end of 1940, the remainder of its surplus being invested in rapidly depreciating equipment. Neither amount, in our opinion, was excessive or beyond the reasonable needs of the business. There is little other evidence tending to show existence of the purpose prescribed by the statute. A similar analysis of the record of the Express Co. indicates that it, like the Transport Co., had no accumulated earnings and profits beyond its reasonable business needs. As of December 31, 1939, it had earned surplus of $48,330.28 *365 and as of December 31, 1940, it had earned surplus of $60,083.39. Its net current assets as of the same dates were $109,533.08 and $120,567.98. These assets were largely liquid and of necessity must have been kept so; for it was frequently necessary for it to pay out large sums of money in connection with shipping charges, C.O.D. items, etc. It was also expedient for it to be able to make good financial statements at all times. Petitioner was also a self-insurer for large contingent amounts and had obligated itself to pay out $57,500 for terminals which had been purchased for it by Coughlin. Moreover, its general plan had been, as demonstrated by subsequent events, to spend several thousand dollars in the purchase of additional terminals and an office in which its activities could be carried on. Respondent places some reliance upon the fact that loans had been made by both petitioners for short periods of time to Coughlin. This, of course, is frequently a very significant circumstance. Cf. Helvering v. National Grocery Company, supra.Most of these loans, however, were actually loans only in form; for the money which was turned over to Coughlin was *366 expended by him, as it was intended to be expended, in the purchase of properties for the two corporations. This was done rather than waiting until application could be made by the corporations to the state authorities for permission to acquire competing companies and until formal approval of the applications could be secured. In reaching our conclusion we have not overlooked the testimony of a professor in economics, finance and business administration called by the respondent as an expert witness and who expressed the opinion that the earnings and profits of each petitioner were accumulated beyond the reasonable needs of its business. He admittedly had not taken into consideration the intention of the petitioners to acquire additional equipment and facilities or their ambition to be in a financial position where they could, under appropriate circumstances, acquire the equipment or facilities of some of their competing companies. Apparently he also had given slight, if any, consideration to the fact that both companies were perforce self-insurers in substantial amounts and had also failed to take into consideration the fact that the Express Co. was frequently required to pay substantial *367 amounts to connecting carriers. Under the circumstances, therefore, we have chosen to rely upon our own appraisal of the evidence rather than upon the opinion expressed by this witness. Upon a consideration of all of the evidence we have concluded that neither petitioner permitted its earnings and profits to accumulate beyond the reasonable needs of its business and that the presumption attaching to respondent's determination has been overcome. We therefore hold that he erred in determining the deficiencies in tax in each proceeding. Uncontested adjustments in some of the proceedings make it necessary that recomputations of the deficiencies be made. Therefore Decision will be entered in each proceeding under Rule 50. Footnotes
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 25 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 35 per centum of the undistributed section 102 net income in excess of $100,000. (b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. (d) Definitions. - As used in this chapter - (1) Section 102 Net Income - The term "section 102 net income" means the net income minus the sum of - (A) Taxes. - Federal income, war-profits, and excess-profits taxes paid or accrued during the taxable year, to the extent not allowed as a deduction by section 23, but not including the tax imposed by this section or a corresponding section of a prior income-tax law. (B) Disallowed Charitable, etc., Contributions. - Contributions or gifts payment of which is made within the taxable year, not otherwise allowed as a deduction, to or for the use of donees described in section 23 (o), for the purposes therein specified. (C) Disallowed Losses. - Losses from sales or exchanges of capital assets which are disallowed as a deduction by section 117 (d). (2) Undistributed Section 102 Net Income. - The term "undistributed section 102 net income" means the section 102 net income minus the basic surtax credit provided in section 27 (b), but the computation of such credit under section 27 (b) (1) shall be made without its reduction by the amount of the credit provided in section 26 (a), relating to interest on certain obligations of the United States and Government corporations. (a) Tax on Personal Holding Companies. - For surtax on personal holding companies, see section 500.↩
2. Both subsequently affirmed by CCA-2. (137 Fed. (2d) 424, and 138 Fed. (2d) 512↩.