ALMOURS SECURITIES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 78544. Promulgated November 13, 1936.

*Earl W. Shinn, Esq., E. H. Batson, Esq., Charles M. Trammell, Esq.,* and *Warren W. Grimes, Esq.,* for the petitioner.

*DeWitt M. Evans, Esq.,* and *H. D. Thomas, Esq.,* for the respondent.

## OPINION.

SMITH: The respondent has held that the petitioner is subject to tax for 1931 and 1932 under the provisions of section 104 of the Revenue Acts of 1928 and 1932. There are no material differences between the provision in the two acts. Section 104 of the Revenue Act of 1928 provides in part as follows:

(a) If any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its share-holders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, there shall be levied, collected, and paid for each taxable year upon the net income of such corporation a tax equal to 50 per centum of the amount thereof, which shall be in *addition to the tax imposed by section 13 and shall be computed, collected, and paid upon the same basis and in the same manner and subject to the same provisions of law, including penalties, as that tax.

(b) The fact that any corporation is a mere holding or investment company, or that the gains or profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax.

\*          \*          \*          \*          \*          \*          \*

(d) The tax imposed by this section shall not apply if all the shareholders of the corporation include (at the time of filing their returns) in their gross income their entire distributive shares, whether distributed or not, of the net income of the corporation for such year. \* \* \*

On May 12, 1931, the respondent mailed a deficiency notice to the petitioner advising it that it was subject to tax under the provisions of section 220 of the Revenue Act of 1926 and section 104 of the Revenue Act of 1928 for the years 1927, 1928, and 1929, in the aggregate amount of $7,777,933.42. Section 220 of the Revenue Act of 1926 is substantially the same as section 104 of the Revenue Act of 1928. On June 6, 1931, the petitioner filed a petition with this Board, Docket No. 58864, for a redetermination of the deficiencies for 1927, 1928, and 1929. Before any hearing was had by this Board upon the merits the petitioner and the respondent on October 19, 1931, filed a stipulation with this Board to the effect "that there is no

deficiency in Federal income tax due from the above named petitioner for the calendar years 1927, 1928, and 1929 and that the Board may enter an order accordingly." Pursuant to such stipulation this Board on October 19, 1931, entered the following decision:

Under written stipulation filed by the parties in the above entitled proceedings and filed with the Board on October 19, 1931, it is—

ORDERED and DECIDED that there are no deficiencies for the years 1927, 1928, and 1929.

The respondent, on October 27, 1931, advised the petitioner:

Reference is made to your protest against the proposed application of Section 104 of the Revenue Act of 1928 for the year 1930, as announced in Bureau letter dated August 14, 1931.

You are advised that after carefully considering all of the facts and circumstances set forth in your protest and the additional evidence submitted at the hearing afforded your representative on September 16, 1931, before the Office of the General Counsel of the Bureau, such protest is sustained.

Accordingly, it is held that you are not subject to taxation for the year 1930 under the provisions of Section 104 of the Revenue Act of 1928.

The petitioner makes the contention that the Board is estopped by the judgment entered October 19, 1931, to determine deficiencies for the years 1931 and 1932, since, as it contends, the facts relating to the years 1931 and 1932 are not substantially different from those which obtained with respect to the years 1927, 1928, and 1929.

In *United Business Corporation of America*, 33 B. T. A. 83, one of the questions presented was whether the taxpayer was liable to tax under section 220 of the Revenue Act of 1921 for the years 1922 and 1923. The Board had held that the taxpayer was liable to tax under section 220 of the Revenue Act of 1921 for the year 1921 and our decision in that case was affirmed (C. C. A., 2d Cir.), 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. In our opinion in the latter case we said:

The respondent's contention that such prior decision, involving this same taxpayer, is *res judicata*, as to the present proceeding, is without merit. The application of section 220, *supra*, in any particular taxable year is wholly dependent upon whether the facts and circumstances pertaining to that year bring the taxpayer within the scope of that section—that is, was the corporation *availed* of for the prohibited purpose during the taxable year in question, irrespective of a finding by the Board and the courts that it was so availed of in a prior taxable year. We do not deem it necessary to enter into a discussion of the principle of *res judicata*, when clearly such principle is not applicable here.

The ruling made in that case is equally applicable to the proceeding at bar. In this proceeding the respondent is not contending that the petitioner is liable to any deficiencies for the calendar years 1927, 1928, and 1929. The respondent admits that the decision en-

tered by the Board in Docket No. 58864 on October 19, 1931, is conclusive, so far as those years are concerned. What the respondent is contending here is that the petitioner is liable to deficiencies for the years 1931 and 1932 and that the Board is not estopped by the judgment entered in Docket No. 58864 from considering the question on the merits with respect to those years. We sustain that contention.

It should be noted that in respect of the proceeding in Docket No. 58864 neither the law nor the facts of the case were judicially ascertained. When the petitioner and the respondent submitted the stipulation on October 19, 1931, the Board was not advised as to the reason for the stipulation. For aught the Board knew there had been an error on the part of the respondent in the determination of the deficiencies or the deficiencies had been paid.

Under the statute, liability for the tax imposed by section 104 of the Revenue Acts of 1928 and 1932 is incurred if the petitioner was either "formed" or "availed of" for the interdicted purpose. The petitioner strenuously contends that the prior decision of the Board is tantamount to a finding by it that the petitioner was not "formed" for the interdicted purpose and that that question may not be inquired into by the Board in this proceeding; in other words, that the doctrine of *res judicata* bars this Board from considering the purpose for which the petitioner corporation was formed.

In view of the fact that in the prior case the Board did not judicially determine the applicability of section 220 of the Revenue Act of 1926 and section 104 of the Revenue Act of 1928, we are of the opinion that the petitioner's contention is without merit. Cf. *Wayne Body Corporation*, 22 B. T. A. 401; *Stanley Co. of America*, 26 B. T. A. 705; *Sand Springs Railway Co.*, 31 B. T. A. 392; *Keener Oil & Gas Co.*, 32 B. T. A. 186; *D. F. Strickland*, 32 B. T. A. 804; *E. A. Hughes*, 32 B. T. A. 1248.

Liability for the tax imposed by section 104 (a) of the applicable taxing statutes is not incurred unless a corporation is (1) formed or (2) availed of "for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains and profits to accumulate instead of being divided or distributed." There must be such an intent on the part of those who were responsible for the organization of the corporation, or for the conduct of its operations. *United Business Corporation of America* v. *Commissioner, supra; United States* v. *Tway Coal Sales Co.* (C. C. A., 6th Cir.), 75 Fed. (2d) 336; *Irvington Investments Co.*, 32 B. T. A. 1165.

The petitioner contends that it was formed for the purpose of engaging in the business of banking and real estate development upon a large scale. It gives as the reason why it did not do so during

the earlier years of its existence that the Florida land boom collapsed in 1925, with the result that the Florida banks were all left in a precarious condition and that the Florida real estate market was stagnant. Then followed the stock market crash in 1929 and the resulting business depression. Petitioner further contends that it was its plan to build up a surplus of approximately $55,000,000 to carry out its banking program and an additional reserve of approximately $70,000,000 to conduct its real estate developments.

The facts leading up to the organization of the petitioner are that prior to 1926 Alfred I. du Pont had some unfortunate experiences with a corporation known as the Nemours Trading Co. He sustained large losses upon his investments in that company. In 1925 or 1926 he obtained an income tax refund from the Government which, including interest, amounted in the aggregate to more than $2,000,000. John Zimmerman had been employed as a certified public accountant in the adjustment of these tax liabilities and in the opening up of books of account to be kept by du Pont. Zimmerman deposed that he was then:

* * * requested to do some research work in connection with various taxes, such as the Delaware State income tax, the Federal income tax, gift taxes and inheritance taxes, in connection with the Delaware State income taxes and, also, the Delaware inheritance taxes. I recommended to Mr. du Pont that he change his domicile from Delaware to Florida, which had no state income and/or inheritance taxes.

As a result of this recommendation of Zimmerman, du Pont changed his domicile from Delaware to Florida in either 1925, or the early part of 1926. At that time du Pont's fortune consisted largely of shares of stock of the du Pont Co. From these shares he was receiving dividends of from $2,000,000 to $3,000,000 per annum, which amounts were greatly in excess of his current needs. Zimmerman was then requested to go to Florida and become associated with du Pont's enterprises. In answer to the question, When did you first go to Florida and under what circumstances? Zimmerman further deposed:

In July 1926, after it had been explained to me that the policy of the office was one of ultra-conservatism, that Mr. du Pont's affairs now having acquired a highly liquid shape, that they would retain their high degree of liquidity and conservatism, that every effort would be made to maintain this conservative policy and prevent entangling messes, such as had previously been cleaned up by Mr. Ball.

He further deposed:

As far back as the spring of 1926,, when the proposition of employment was first made to me, it was understood that the estate was to be kept in a highly liquid shape. * * *

Zimmerman became the first comptroller of the petitioner and served in that capacity from December 1, 1926, to some time in January 1929.

Upon the organization of the petitioner du Pont turned over to it all of his holdings in the du Pont Co., of a fair market value at the time of something in excess of $31,000,000. All of the shares of stock first issued by the petitioner, except five qualifying shares, were turned over to du Pont in exchange for the securities transferred by him to it. At subsequent dates he turned over additional securities for additional shares of stock. Petitioner thus became the owner of substantially all of the securities formerly owned by du Pont. In 1927 Jessie Ball du Pont turned over securities to the petitioner of an approximate value of $2,700,000 for shares of stock, and Edward Ball, du Pont's brother-in-law, also turned over securities to the petitioner in exchange for shares of its stock.

Zimmerman made up the petitioner's income tax return and those of its stockholders for 1926. In the preparation of the returns he questioned his superiors as to whether the petitioner should not be recognized as one subject to the provisions of section 220 of the Revenue Act of 1926 and whether he should not include in the income tax returns of the stockholders their pro rata shares of the undistributed earnings in accordance with the provision of section 220 (e) of the Revenue Act of 1926. The question was referred to income tax counsel who instructed Zimmerman to prepare the income tax returns of the stockholders without including therein the undistributed income of the petitioner. He raised the same question in the preparation of the return for 1927. The record upon this point reads as follows:

Q Did the matter of the manner of handling these dividends become the subject of further discussion between you and officers of the corporation?

A I mentioned it a number of times.

Q To whom?

A To both Mr. Ball and Mr. Batson. By the time the 1927 return was in course of preparation the question arose again. By that time the subject had gotten to be a rather, apparently, a distasteful one and I was told rather curtly to prepare the returns in the way I did and let the question of legality go for decision by Mr. Batson.

The deposition of Zimmerman is further illuminating with respect to the contentions of the petitioner that it was organized for the purpose of engaging in the banking business and in real estate development. From such deposition it appears that the acquisition of shares of stock of the Florida National Bank of Jacksonville, its first acquisition of bank stock, was to enable the petitioner to obtain control of a bank in Jacksonville in which it might safely deposit its funds. Alfred I. du Pont severely criticized Zimmerman for having made

a large deposit in one of the banks in Jacksonville before the petitioner had obtained control of the bank.

In January 1929 Zimmerman suggested to du Pont that the petitioner acquire control of a large chain of banks in Florida and permit him to own a substantial interest in the company which was to be formed to acquire them. Du Pont stated to Ball that the proposition was "preposterous." He addressed a memorandum to Zimmerman dated January 5, 1929, reading as follows:

I have before me your letter of January 5th, setting forth in detail, your proposition involving control of the Jacksonville Banks and others in the State, as specifically set forth.

This proposition does not appeal to me, as it is not in line with the plan for developing the Almours Securities, Inc. Banking, in the abstract, does not appeal to me in the least.

Shortly after January 5, 1929, Zimmerman was summarily discharged as comptroller of the petitioner.

With regard to the real estate development Zimmerman deposed in part as follows:

Q And what other corporations were operated or were organized during the time you were connected with the Almours Securities?

A During 1925 Mr. Ball purchased the properties of a Mr. Covington in Bay County, Florida, located on the East Peninsula. A corporation was organized in the early part of 1927 which took title to that property. This corporation was named the Panama Beach Development Company.

Q Who owned the stock in that corporation?

A Mr. du Pont, Mrs. du Pont and Mr. Ball owned one-third each of 85% of the total stock; Mr. Edward H. Batson acquired 10% and I acquired 5% of the stock that was issued.

Q Were you acquainted with the plans and intentions in relation to the development of this real estate?

A Yes, sir.

Q And what were they?

A That the properties would be sold in small parcels as soon as a suitable buyer could be found at a profit.

Q Was any of it sold during your time?

A No.

Q Were any plans made in respect to improving the properties or developing the properties by yourself?

A None at all during the years from 1925 to the end of 1928.

Q Was it the intention to improve the properties yourselves? When I talk about "yourselves" I am talking about the stockholders of these corporations you have mentioned.

A There was no intention of developing the property; the thing was offered to me as a short term speculation. I couldn't have taken the proposition if there had been any intention to carry on a long term development program involving the investment of additional funds.

It is further in evidence that many attempts were made by the corporations holding title to most of the lands in the western part

of Florida to sell them at a profit, but that no attempts were made to develop them.

From the organization of the corporation to the end of 1932 the petitioner confined its activities principally to the collection of its income, the investment of its funds, the operation of a small concession at Mt. Vernon, Virginia, and the direction of corporate subsidiaries, especially of banking corporations in which it owned a controlling interest. The petitioner contends that the supervision of the banking corporations took up much of the time of its officers and required the services of several other employees. It is apparent, however, from a consideration of all of the evidence that the operating activities of the corporation were of little consequence. Petitioner's tax returns for 1931 and 1932 show salaries paid to officers of $200,000 and $215,000, respectively, and other "salaries and wages" of $55,382.55 and $36,051.31, respectively.

The evidence conclusively shows that the petitioner was primarily a "holding or investment company." The name of the corporation is indicative of its character. Its return for 1926 describes the corporation's "Kind of Business" as "Owners of Investment Securities"; the returns for 1927, 1928, and 1929, after the same title, have simply the phrase "Investment Securities"; the return for 1930, after the same title, "Owners Investment securities"; that for 1931 "Real Estate, Banking, Timber Operations, etc."; and that for 1932 "Banking, etc."

The petitioner was a family corporation. It took over substantially all of the securities formerly owned by Alfred I. du Pont and large quantities, if not substantially all, of those owned by Jessie Ball du Pont and Edward Ball in exchange for its shares of stock. It retained most of these securities to the end of 1932 and utilized most of its earnings in the acquisition of other securities and in the purchase of income-producing real estate.

The petitioner's total earnings to the end of 1932 amounted to $22,463,674.97. Of this amount only $4,433,693.05 was distributed in the form of cash dividends to the end of the year 1932. Most of the balance was invested in securities or in the purchase of income-producing real estate in Jacksonville. The principal stockholders of the petitioner escaped the payment of large amounts of surtaxes by the failure of the petitioner to distribute as cash dividends its accumulated earnings.

Section 104 (b) of the Revenue Acts of 1928 and 1932 provides: "The fact that any corporation is a mere holding or investment company, * * * shall be prima facie evidence of a purpose to escape the surtax." The petitioner contends that this prima facie presumption does not apply to it for the reason that it was some-

thing more than a "mere" holding or investment company. Even assuming that the petitioner in its actual operations was something more than a "mere" holding or investment company, it was, nevertheless, the type of corporation which, in our opinion, Congress had in mind in the enactment of section 104 of the Revenue Acts of 1928 and 1932 and similar provisions of the earlier acts. If it was "formed" for the purpose specified in the acts, it is immaterial whether the prima facie presumption applies or not. Cf. *Rands, Inc.*, 34 B. T. A. 1094.

We think that it may be said in this case, as was said in *United Business Corporation of America, supra*, that "Here the purpose [of the formation of the corporation] appears to us, if not transparent, at least plain enough to leave no doubt."

From a consideration of all of the evidence the conclusion is inescapable that the petitioner was formed "for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its gains or profits to be accumulated instead of being divided or distributed."

Coming now to the question of whether the petitioner was "availed of" for the interdicted purpose for the years 1931 and 1932, the evidence shows that the petitioner's book income for those years was $2,585,795.57 and $1,563,201.18, respectively, and that the dividends paid were $863,839.15 and $867,660.40, respectively. From the date of its inception to the end of 1932 the corporation accumulated undistributed earnings and profits amounting to more than $18,000,000. The petitioner contends that this accumulation was necessary to carry out the purpose of its organization. We are of the opinion, however, that there is no merit in this contention. The petitioner had substantially no liabilities. It was not actively engaged in any business which required this large accumulation of earnings. Its assets were approximately 90 percent liquid. Its balance sheet at December 31, 1930, showed a surplus of $7,882,959.52. The evidence does not show that there were "reasonable needs" for any further accumulation of earnings. The accumulated earnings apparently were already greatly in excess of the reasonable needs of the business.

We conclude from a consideration of all of the evidence that the petitioner was "availed of" in 1931 and 1932 for the purpose specified in section 104 of the Revenue Acts of 1928 and 1932.

Reviewed by the Board.

*Judgment will be entered for the respondent.*