Metal Mouldings Corporation v. Commissioner.
Metal Mouldings Corp. v. Commissioner
Docket No. 107231.
United States Tax Court
1943 Tax Ct. Memo LEXIS 451; 1 T.C.M. (CCH) 616; T.C.M. (RIA) 43087; February 13, 1943
*451 Raymond H. Berry, Esq., 1000 Penobscot Bldg., Detroit, Mich., and Ralph W. Barbier, Esq., 1000 Penobscot Bldg., Detroit, Mich., Arthur L. Evely, Esq., 1000 Penobscot Bldg., Detroit, Mich., for petitioner. Philip M. Clark, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined the following deficiencies: Income
Excess Profits
Year
Tax
Tax
1939
$65,825.01
$29.80
Petitioner concedes that the adjustments to net income were proper, that the deficiency in excess-profits tax is correct and that there is a deficiency in income tax in the amount of $88.70. The only question to be decided is whether petitioner was subject to the surtax imposed by section 102 of the Internal Revenue Code on corporations improperly accumulating surplus. Findings of Fact Petitioner is a Michigan corporation with offices at 4559 Wesson Avenue, Detroit, Michigan. It filed its corporation income and excess-profits tax return for 1939 with the collector of internal revenue for the district of Michigan. Petitioner was organized December 21, 1924. Its authorized capital stock was 250 shares, common, of a par value of $100 each, all *452 of which were issued upon its incorporation. Its articles of incorporation were amended in 1927 increasing its authorized capital stock to 500 shares common of the par value of $100 each. They were again amended in 1935 increasing the capital stock to 1,500 shares of common of the par value of $100 each. In December, 1935, a nontaxable stock dividend in the amount of $60,150 was declared by petitioner and was charged against surplus. The following table shows the issued and outstanding stock of petitioner and all changes in its ownership during the period material here: C. P.
G. A.
Cham-
Cham-
Robert
Guy W.
B. W.
John R.
B. J.
Date
berlin
berlin
Pierce
Schrock
Smith
Toner
Carl
Total
12/27/35
318
56 21 5 1 401
Stock Div
+477
+84
+31 1/2
+7 1/2
+1 1/2
12/28/35
795
140
52 1/2
12 1/2
2 1/2
1002 1/2
12/23/39
-50
+10
25
15
745
140
52 1/2
22 1/2
2 1/2
25
15
1002 1/2
1/5/40
-45
+10
+25
+10
700
140
52 1/2
32 1/2
2 1/2
50
25
1002 1/2
Petitioner was formed for the purpose of manufacturing and selling rolled metal shapes, commonly known as the bright work for automobiles and, at all times since *453 its incorporation, has been engaged in that business. It is not a holding or investment company and was not formed for the purpose of preventing the imposition of surtax on any of its shareholders. From its incorporation in 1924 to 1930 petitioner did not have any credit standing and was unable to discount its bills. From 1930 to 1934 it was able to secure some credit but was unable to meet all of its bills on their discount date. After 1934 petitioner discounted all of its bills, which were paid twice a month. The following statement shows petitioner's net income, income and excessprofits taxes, net income after taxes, capital and surplus as indicated thereon for the years ending December 31, 1924, through December 31, 1933. Red figures are shown in parentheses. Income
and Excess
Net
Adjust-
Net
Profits
Income
ments to
Date
Income
Tax
After Tax
Capital
Surplus
Dec. 31, 1924
None
None
None
$25,000.00
None
Dec. 31, 1925
($ 7,559.62)
None
None
25,000.00
None
Dec. 31, 1926
(4,401.67)
None
None
25,000.00
None
Dec. 31, 1927
14,175.50
$ 28.92
$14,146.58
40,000.00
None
Dec. 31, 1928
(1,896.82)
None
None
40,100.00
None
Dec. 31, 1929
(12,851.85)
None
None
40,100.00
($ 76.55)
Dec. 31, 1930
18,472.17
86.82
18,385.35
40,100.00
(274.38)
Dec. 31, 1931
(4,479.78)
None
None
40,100.00
Dec. 31, 1932
(27,768.06)
None
None
40,100.00
(657.60)
Dec. 31, 1933
16,163.23
2,222.44
13,940.79
40,100.00
(432.50)
*454 Date
Surplus
Dec. 31, 1924
None
Dec. 31, 1925
($ 7,559.62)
Dec. 31, 1926
(11,961.29)
Dec. 31, 1927
2,185.29 Dec. 31, 1928
288.47 Dec. 31, 1929
(12,486.83)
Dec. 31, 1930
5,624.14 Dec. 31, 1931
1,144.36 Dec. 31, 1932
(27,261.30)
Dec. 31, 1933
(13,773.01)
The following is a comparative schedule showing the current assets, liabilities, net working capital and ratio of current assets to current liabilities as of December 31, 1934 through December 31, 1939. December
December
December
December
December
1934
1935
1936
1937
1938
Cash
$ 6,884.50
$ 31,152.98
$ 67,264.41
$100,530.99
$ 95,229.47
Bonds Held for Short
Periods
150,000.00
200,000.00
250,034.49
250,078.13
Receivables
89,228.51
251,344.77
306,870.61
117,276.32
222,908.36
Inventories
22,423.27
43,843.64
138,840.23
112,173.41
117,441.29
TOTAL CURRENT
ASSETS
$118,536.28
$476,341.39
$712,975.25
$580,015.21
$685,657.25
CURRENT LIABILITIES
Notes Payable
$ 7,801.79
$ 58,000.00
$100,015.63
$ 50,000.00
$ 50,000.00
Accounts Payable
72,167.82
138,663.51
173,889.12
53,979.66
63,076.78
Accrued Liabilities.
9,498.49
91,418.07
129,382.73
92,886.74
87,634.34
TOTAL CURRENT
LIABILITIES
$ 89,468.10
$288,081.58
$403,287.48
$196,866.40
$200,711.124
Net Working Capi-
tal
$ 29,068.18
$188,259.81
$309,687.77
383,148.81
$484,946.13
Ratio of Current As-
sets Over Current
Liabilities
1.32
1.65
1.77
2.95
3.42
*455 December 1939
Cash
$272,585.11
Bonds Held for Short
Periods
Receivables
257,605.36
Inventories
116,131.11
TOTAL CURRENT
ASSETS
* $646,321.58
CURRENT LIABILITIES
Notes Payable
Accounts Payable
$ 99,118.29
Accrued Liabilities
192,251.85
TOTAL CURRENT
LIABILITIES
$291,370.14
Net Working Capi-
tal
$354,951.44
Ratio of Current As-
sets Over Current
Liabilities
2.22
Prior to 1935 no dividends were paid by petitioner. Petitioner's net income, Federal income tax, net income after tax, total dividends declared, percentage of dividends to net income after tax, and earned surplus as shown by its balance sheets at the end of the years from 1934 to 1940 inclusive were as follows: Percentage of
Dividends
to Net
Federal
Net
Total
Income After
Net
Income
Income
Dividends
Federal
Years
Income
Tax
After Tax
Declared
Income Tax
1934
$ 37,788.62
$ 5,210.36
$ 32,578.26
None
1935
352,576.36
64,629.13
267,947.23
$ 80,200.00
28
1936
405,634.08
84,986.87
320,647.41
150,450.00
56
1937
368,686.86
74,922.33
293,764.53
175,437.50
60
1938
333,322.25
59,555.31
273,766.94
175,437.50
64
1939
509,011.01
92,120.35
416,890.66
* 300,750.00
72
1940
601,347.11
177,650.90
423,686.21
300,750.00
71
$2,570,557.67
$553,864.69
$2,016,712.98
$1,213,025.00
*456 Surplus
Decem-
Years
ber 31
1934
$ 60,696.41
1935
162,804.22
1936
304,601.63
1937
426,351.70
1938
326,027.45
1939
386,757.12
1940
428,703.33
Petitioner's cash position on January 1, 1940 was $272,585.11. At the end of January 1940 its cash on hand, after paying the dividend of $100,250 on January 15th, was $259,000. The following schedule shows the dividends paid from 1935 through 1940. DIVIDENDS Dividend
Date
Date
Number
Shares
Rate
Declared
Paid
Amount
Total
1
401    $ 25.00
5/13/35
5/31/35
$ 10,025.00
2
401    50.00
8/16/35
8/16/35
20,050.00
3
401    125.00
12/14/35
12/28/35
50,125.00
$ 80,200.00
4
1002 1/2
25.00
3/27/36
4/15/36
25,062.50
5
1002 1/2
50.00
5/28/36
6/12/36
50,125.00
6
1002 1/2
75.00
8/31/36
9/12/36
75,187.50
7
1002 1/2
30.00
12/1/36
12/29/36
30,075.00
180,450.00
8
1002 1/2
25.00
3/1/37
3/10/37
25,062.50
9
1002 1/2
50.00
5/29/37
6/15/37
50,125.00
10
1002 1/2
100.00
6/31/37
9/14/37
100,250.00
175,437.50
11
1002 1/2
50.00
3/8/38
3/10/38
50,125.00
12
1002 1/2
25.00
5/12/38
6/10/38
25,062.50
13
1002 1/2
50.00
8/30/38
9/12/38
50,125.00
14
1002 1/2
50.00
11/29/38
12/12/38
50,125.00
175,437.50
15
1002 1/2
50.00
2/28/39
3/14/39
50,125.00
16
1002 1/2
50.00
6/5/39
6/15/39
50,125.00
17
1002 1/2
50.00
8/31/39
9/12/39
50,125.00
18
1002 1/2
50.00
12/1/39
12/15/39
50,125.00
200,500.00
19
1002 1/2
100.00
12/27/39
1/15/40
100,250.00
100,250.00
20
1002 1/2
50.00
2/16/40
3/15/40
50,125.00
21
1002 1/2
50.00
5/31/40
6/14/40
50,125.00
22
1002 1/2
100.00
8/30/40
9/12/40
100,250.00
23
1002 1/2
100.00
12/10/40
12/16/40
100,250.00
300,750.00
TOTAL DIVIDENDS
$1,213,025.00
*457 If all of petitioner's earnings or profits in 1939 had been distributed as dividends the surtax of its two principal stockholders, Chamberlin and his wife, who were in control of the corporation through their stock ownership, would have been materially increased. Chamberlin's surtax would have been increased approximately $103,000 and his wife's surtax would have been increased approximately $9,000. Petitioner's gross sales, less returns and allowances, averaged slightly more than $2,000,000 per annum from 1935 through 1940. The total for 1939 was $2,187,817.93 and for 1940 $2,585,151.24. Its principal customers were Ford Motor Company and Chrysler Corporation. Its sales to these companies constitutes about 96 percent of its business. In each month during the model year petitioner received from Chrysler Corporation a notice of releases for the succeeding month, tentative releases for the second succeeding month and authorization to purchase raw materials for the third succeeding month. In the case of the Ford Motor Company the orders were for a definite number of parts to be delivered on definite dates. Petitioner's officers, therefore, could estimate the gross sales of the business *458 for at least three months in advance. On this basis petitioner's president estimated in December, 1939, that its sales for the succeeding three months would be as follows: January, 1940, $272,262.52; February, 1940, $229,836.21, and March, 1940, $193,439.81. Its actual sales were $296,367 for January, $212,698 for February and $203,305 for March. Based on the estimates and the general trend of sales of automobiles for which petitioner was supplying parts petitioner's president was also of the opinion that its business for 1940 would exceed its business for 1939. This prediction was correct. Petitioner's average cash disbursements for any particular month were approximately seventy per centum of its gross sales for such months. The Ford Motor Company paid petitioner on or about the 22nd of each month the aggregate amount owing for parts supplied in the preceding month. The Chrysler Company paid for parts supplied to it about the 27th of the following month. Petitioner's bills from the 1st to the 15th of the month were paid on the 25th of the current month and bills between the 15th and the end of the month were paid on the 10th of the succeeding month. When petitioner received an *459 order from Ford or Chrysler it was first necessary to acquire the tools for the manufacture of the parts. This expense occurred at least once each year, and amounted to approximately $125,000. Petitioner furnished the amount expended for tools but was subsequently reimbursed by the purchaser of the parts. In the case of Chrysler Corporation reimbursement was made about thirty days after receipt of approved production parts; but in the case of Ford Motor Company reimbursement was made only after the parts had been approved by Ford's inspection department and the account had been audited by that company. Sometimes this was many months after the tools had been produced. Normally several months would elapse from the time petitioner started to acquire the tools until the production part had been approved by the automobile manufacturer and reimbursement made. In the taxable year, and at all times prior thereto, petitioner rented the building in which it conducted its business. In 1939 it occupied space in a building located on Wesson Avenue, Detroit, Michigan, which it had originally leased from the General Cable Corporation in April, 1935. The original lease, which had been amended at *460 various times to provide for additional space, was for a term of five years, or until it should terminate prior thereto according to its terms. A new lease extending the old one was entered into September 12, 1939, for a further term of 5 years from July 15, 1940. It covered approximately 90,705 square feet of space at a rental of $20,100 per year. Each lease provided that, notwithstanding any of the provisions therein, the landlord should have the privilege of terminating it in advance of the expiration date, or any extension thereof, by giving at least six months notice to the tenant specifying a date of termination. The lease of September 12, 1939, further provided that in the event the landlord should receive an acceptable offer from a third party to purchase the property, or any part leased to petitioner, the landlord would notify petitioner of the amount and terms of the offer and petitioner would thereafter have ten days within which to purchase the plant or such part thereof upon the same terms as those in the offer. Petitioner's contact with the Chrysler Corporation called for the supplying of a certain percentage of the parts required by Chrysler but petitioner was not *461 the sole source of supply. Petitioner's contract with Ford Motor Company, however, called for the supplying of a definite number of parts and petitioner was Ford's sole source of supply for such parts. It was of the utmost importance therefore that petitioner keep itself in a position to carry out these contracts. Failure to make deliveries to either of the companies when it was in heavy production would have endangered petitioner's business relations with it. In the case of the Ford Motor Company it would have caused a shut down of the plant to the extent of the models supplied. If this had occurred petitioner, in all probability would have lost the Ford business. In order to avoid the possibility of having to move during a period of heavy production it was necessary that petitioner place itself in a position either to buy the leased property which it occupied or to acquire a suitable property for its business. This was especially important because the General Cable Corporation was attempting to sell the property occupied by petitioner. To provide for such a contingency petitioner in 1938 established a "Reserve for New Building" in the amount of $200,000. In 1939 the General Cable *462 Corporation offered to sell its building to petitioner for $271,000, and in that year petitioner increased its "Reserve for New Building" to 250,000. This reserve was then invested in United States Treasury Bonds in the amount of $256,093.76. In 1941 petitioner acquired land and erected a new building thereon at a cost for land, building and improvements of $316,182.19. It moved into the new building in August of 1941. The cost of moving was approximately $12,000 and the cost of new machinery made necessary on account of moving was $30,000 making a total over all cost of $388,182.19. As the new building was constructed the bonds from "Reserve for New Building" were sold and the proceeds used to pay part of the costs of construction. When the building was completed the reserve was written off petitioner's books. The General Cable Corporation sold its building, including the lease, and petitioner paid $5,000 early in 1942 to be released therefrom. From 1935 to 1938, inclusive, petitioner followed the practice of buying United States Treasury Discount Bills in December and selling them early in the following year. These bonds were carried on the balance sheet as of December 31 and *463 were bought to reduce petitioner's cash balance in Detroit banks during the period assessment of personal property for local taxes was being made. The bonds were usually sold soon after the assessment date, which was December 31, and the cash was then made available for petitioner's business. The bonds were treated on petitioner's books as current assets. The bonds purchased in December, 1937, were sold in January, 1938, but repurchased and resold April 6, 1938, due to the fact that petitioner was informed that the assessment date might be shifted to April 1st. For the same reason the bonds purchased in December, 1938, were sold April 20, 1939. The amount of bonds so bought and sold were as follows: Bought
Amount
Final Sale
December 1935
$150,000.00
January 8, 1936
December 1936
200,000.00
January 27, 1937
December 1937
250,034.49
April 6, 1938
December 1938
250,078.13
April 20, 1939
No bonds were bought for this purpose in 1939. *
Chamberlin, who later became *464 the controlling stockholder of petitioner, was one of its original incorporators and officers. Prior to the organization of petitioner, Chamberlin was associated with Joseph N. Smith & Company, a corporation located in Detroit, Michigan, which was engaged in a business similar to that of the petitioner. He had been associated with that company in the capacity of designing engineer for approximately twenty years. Prior to the formation of petitioner, the largest income Chamberlin had ever received in any one year was approximately $8,000. Chamberlin's compensation from petitioner consists of a salary and a commission of two percent on sales. His salary for the year 1939 was $24,000 and his total compensation in that year was $76,440.62. His wife's salary as vice president was $9,000. In addition to Chamberlin, the president of petitioner, there were three key men in the organization, John H. Toner, Benjamin Carl and Guy Schrock. These men had been with petitioner for a number of years and were an important part of its organization. Chamberlin, over a period of several years, had been thinking about giving these men some of his stock because he wanted them to become a part of the company *465 and to share in its profits. In December of 1939 he decided to give them a total of ninety-five shares of stock. John H. Toner was to receive fifty shares, Guy W. Schrock twenty shares, and B. J. Carl twenty-five shares. One of the conditions of the gifts was that each donee should pay any Federal gift tax which arose by reason thereof. The gifts were made, half of the shares being delivered to the donees in 1939 and the other half in 1940. The gifts were split and made in the two years in order to minimize the resulting gift tax through claiming an exclusion in each year. During 1939 petitioner paid four quarterly dividends of $50 per share each, aggregating $200,500. In the latter part of December, 1939, Chamberlin was advised by the company's counsel and by the secretary of the company, who was also a certified public accountant, that because of Treasury Decision 4914 the corporation should declare dividends for the year 1939 in an amount equal to at least 70 percent of its earnings. [1] Prior to this advice petitioner had no intention of declaring an extra dividend in 1939. Chamberlin did not want the corporation to declare the extra dividend because of its cash position. *466 The cash on hand as of December 31, 1939 ($272,586.11) was not considered to be excessive in view of the fact that 96 percent of petitioner's business was with Ford and Chrysler and subject to unusual business hazards. Ford owned the tools used by petitioner in the manufacture of parts for its automobiles and could withdraw them at any time. Its orders covered only about three months and it was under no obligation to give petitioner a repeat order. Petitioner's responsible officers were of the opinion its current assets should be at least 2 1/4 times its current liabilities. Nevertheless petitioner, on December 26, 1939, declared an extra dividend in the amount of $100 per share of $100,250, payable January 15, 1940. One of the reasons for deferring the payment of this dividend was to permit an aliquot portion of it to be collected by the employees or key men to whom Chamberlin had made the gifts of stock referred to above. The question *467 of the effect of the payment or non-payment of a dividend during 1939 on Chamberlin's personal income and surtax liability or on that of his wife was never discussed. Chamberlin, however, was familiar with the tax consequences of business transactions, knew that the petitioner was not supposed to carry an unnecessary or excessive amount of surplus, and largely shaped its policy. The policy of petitioner with reference to the payment of dividends had always been liberal. Petitioner was not availed of for the purpose of preventing the imposition of surtax upon its stockholders. Opinion As stated at the outset but one question is presented: Was petitioner availed of during the taxable year for the purpose of preventing the imposition of surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed? If so, it is liable for the tax imposed by section 102 of the Internal Revenue Code. [2]
*468 Petitioner was formed solely for the business purpose of manufacturing parts for automobiles and selling them to automobile manufacturers. It is not "a mere holding or investment company." Respondent does not contend that it was formed for the purpose of preventing the imposition of the surtax upon its shareholders, but urges and determined the deficiency upon the theory that it was availed of for that purpose in the taxable year by permitting its earnings or profits to accumulate beyond the reasonable needs of the business. His determination places on petitioner the burden of proving that it was not availed of for the interdicted purpose. Accumulated surplus from earnings or profits of prior years does not affect the tax liability, but becomes of evidentiary importance in determining whether the accumulations in the taxable year were beyond the reasonable needs of the business. Almours Securities, Inc., 35 B.T.A. 61, affd., 91 Fed. (2d) 427, certiorari denied, 302 U.S. 765. Prior to 1935 petitioner did not have earnings or profits sufficient to permit the payment of dividends. In 1935 it began *469 to make money and thereafter its dividend policy was very liberal. From 1935 to 1940, inclusive, it had a total net income after tax of $2,016,702.98 and paid dividends of $1,213,025. In 1939 it had net income after taxes of $416,890.16. From this sum the respondent deducted $200,500, the dividends paid during the year, and treated the difference, $216,390.69, as undistributed net income taxable under section 102. In 1939 petitioner declared and paid four regular quarterly dividends in the amount of $50 per share each, the aggregate amount being $200,500. On December 26, 1939, it declared an extra dividend of $100 per share, aggregating $100,250, making it payable to stockholders of record on January 15, 1940, in order that an aliquot part of it could be collected by the donees of the stock being given to them by Chamberlin. This brought the total distributions out of 1939 income to $300,750 or approximately 72 percent of the total income for that year. In view of the facts surrounding the declaration and payment of the extra dividend it can hardly be said that the amount was withheld for the interdicted purpose. On the contrary the evidence points quite strongly to "a complete lack *470 of the condemned purpose." ( R. L. Blaffer & Co., 37 B.T.A. 851, 856, affd., 103 Fed. (2d) 487, certiorari denied, 308 U.S. 576). On December 31, 1939, petitioner had on hand cash in the sum of $272,585.11. Its average cash disbursements for any particular month were approximately seventy per centum of its gross sales for that month. Its gross sales for January, 1940, which could be and were estimated with reasonable accuracy, were $296,367. Obviously if petitioner had distributed its entire net earnings in 1939 it would have had only $56,194.45 in cash on January 1, 1940, which amount would not have been sufficient to pay its bills on the tenth of January, unless, as respondent argues, the "Reserve for New Buildings", was unnecessary and should in fact be considered a part of earned surplus invested in government securities which could be made available for use in petitioner's business by disposing of the securities. An examination of the circumstances surrounding the creation of the "Reserve for New Buildings" convinces us that the reserve was justified as reasonably necessary in petitioner's *471 business. Under petitioner's lease it could have been dispossessed of its factory buildings at any time after six months notice unless it purchased them. In 1939 the lessor had definitely decided to sell the buildings and petitioner had been informed that they could be bought for approximately $271,000. There can be little doubt that if petitioner had been forced to move during its busy season its production would have been seriously interrupted and it might even have lost the Ford and Chrysler business through failure to fill the orders which they had given for parts. In this situation petitioner set up a reserve of $200,000 in 1938 for a new building, and increased it to $250,000 in 1939. This reserve was invested in United States securities at the end of the taxable year and the securities were later sold to finance the construction of a new factory building. The new building was completed, equipped and paid for in 1941 with no mortgage or outstanding indebtedness at a total cost of $388,000, including new machinery made necessary on account of moving. The purpose of establishing the reserve was not to avoid surtax on petitioner's stockholders. The evidence indicates petitioner *472 set it aside to provide against the contingency of being forced to purchase the buildings then occupied or to build a new one. Cf. Cecil B. DeMille, 31 B.T.A. 1161, affd., 90 Fed. (2d) 12, certiorari denied, 302 U.S. 713; C. H. Spitzner & Son, Inc., 37 B.T.A. 511. Moreover it is obvious from the facts before us that the amount of the reserve set up by petitioner was not excesive and was properly carried on its books. Petitioner's surplus and undivided profit as shown by its balance sheet at the end of the taxable year was $386,737.12. The respondent contends that $60,150 (the amount of nontaxable stock dividends declared in 1935) should be added. While it is true that a nontaxable stock dividend does not decrease earnings available for dividends, August Horrmann, et al., 34 B.T.A. 1178, an increase of surplus by the amount of stock dividends declared in 1935 does not affect our decision here. Petitioner had grown from a business having a net income of $37,788.62 in 1934 to a business with a net income of $509,011.01 in 1939. This growth *473 and expansion required the use in its business of a substantial part of its net earnings. At no time was its surplus invested in securities or loaned to its stockholders. In our judgment the accumulation of petitioner's earnings or profits prior to 1939 was not in excess of the reasonable needs of its business. We also think that its accumulation of earnings and profits in 1939 was likewise for sound business purposes. It is our conclusion therefore and we have accordingly found that petitioner was not availed of during the taxable year for the purpose of preventing the imposition of the surtax on its stockholders. It follows that it is not subject to additional tax under section 102, supra. Cf. L. R. Teeple Company, 47 B.T.A. 270. Decision will be entered under Rule 50.
Footnotes
*. This figure does not include investments in U.S. Securities; $256,093.76 plus accrued interest in the sum of $1,103.41, carried on petitioner's books as Reserve for New Building.↩
*. Of this amount, $100,250.00 was a dividend declared on December 26, 1939, payable to all stockholders of record January 15, 1940, and said dividend was paid on January 15, 1940. The percentage of dividends paid in 1939 was approximately 46%.↩
*. On June 21, 1939 the legislature of the State of Michigan passed Public Act 301 (Mich. Stat. Annotated Vol. 6, Sec. 7.556 (2)) fixing the tax on non-income producing intangibles at 1/10 of 1 percent.↩
1. The Treasury Decision stated inter alis that the returns of corporations which had not distributed at least 70 percent of their earnings as taxable dividends were to be "given close attention to determine whether section 102↩ is applicable."
2. Sec. 102. Surtax on Corporations Improperly Accumulating Surplus. (a) Imposition of tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 25 per centum of the amount of the undistributed section 102 net income not in excess of $100.000, plus 35 per centum of the undistributed section 102 net income in excess of $100,000. (b) Prima facie evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence determinative of purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩