BRIAN J. O'SULLIVAN AND LESLIE J. O'SULLIVAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Sullivan v. Commissioner
Docket No. 30571-88
United States Tax Court
T.C. Memo 1994-395; 1994 Tax Ct. Memo LEXIS 408; 68 T.C.M. (CCH) 407; 94-2 U.S. Tax Cas. (CCH) P47,957; August 18, 1994, Filed *408 Decision will be entered under Rule 155. For petitioners: John W. Sunnen. For respondent: Patrick W. Lucas and Michael R. McMahon. DAWSON
DAWSON
MEMORANDUM OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Helen A. Buckley pursuant to the provisions of section 7443A(b)(4) and rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge. OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: Respondent determined a deficiency in petitioners' 1984 Federal income tax in the amount of $ 52,124, together with additions to tax and increased interest as follows: Additions to Tax and Increased Interest, Secs.
6651
6653(a)(1)
6653(a)(2)
6659
6621(c)
$ 13,031
$ 2,606
[1]
$ 15,637
applies
After concessions, [2] the issues *409 are: (1) Whether respondent is collaterally estopped in this case because of a settlement made in a case involving petitioners' 1986 tax year; (2) whether respondent made a settlement offer to petitioners for 1984 which they accepted; (3) if respondent is not bound by a settlement offer or by principles of collateral estoppel, whether petitioners are entitled to a business bad debt deduction; (4) whether petitioners' return was timely filed; and (5) whether petitioners are liable for additions to tax for negligence. Some of the facts have been stipulated, and they are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner Brian J. O'Sullivan (hereafter petitioner) resided *410 in Los Angeles, California, when the joint petition herein was timely filed. Petitioner Leslie J. O'Sullivan resided in Vancouver, British Columbia, Canada, at that time. Petitioners filed a joint Federal income tax return for 1984 in Fresno, California. Collateral Estoppel. Petitioner previously filed a petition in docket No. 24421-90 for a redetermination of respondent's notice of deficiency, which according to petitioner, entailed the same issues as those in this case but in regard to later years, 1986 and 1987. That case was settled by a stipulated decision entered on March 9, 1993. Petitioners contend that the settlement in that case serves to collaterally estop respondent from pursuing her contentions in this case. We do not agree. It has long been held that collateral estoppel only applies in instances where there has been an adjudication of the merits. Even were we to assume that the facts in the two cases were identical in nature (which in any event we would be unwilling to do), neither this Court nor any other court has made a determination of either the facts or the law. The principle of collateral estoppel is that there has been a prior determination, and *411 that the party should not be given a second opportunity to retry the same issue. Fox v. Commissioner, 61 T.C. 704 (1974); Almours Secur., Inc. v. Commissioner, 35 B.T.A. 61 (1936). As we stated in Fox v. Commissioner, supra at 711: The general principle of collateral estoppel or estoppel by judgment is that a fact decided in an earlier suit is conclusively established between the parties and their privies in a later suit, provided that such fact was necessary to the judgment of the first suit. Hyman v. Regenstein, 258 F.2d 502, 509-511 (C.A. 5, 1958), certiorari denied 359 U.S. 913 (1959). Once the issue is actually determined, it cannot be relitigated between the parties, even in a suit on a different cause of action. * * *
No facts have previously been litigated regarding the bad debt loss. Petitioners' contention that respondent is bound by the earlier settlement is without merit. Acceptance of a Settlement. Petitioner further contends that there has been an offer of a settlement and an acceptance in this case *412 which precludes respondent from doing anything other than accepting a "no deficiency" settlement. One of the issues originally in this case, the so-called Arbutus issue, has been settled by stipulation with respondent conceding the issue. On Schedule C of their Federal income tax return for 1984, petitioners indicated a business activity of "Wind Turbines" which is the activity relevant to the Arbutus issues. On the same schedule was also listed the bad debt deduction of $ 160,000, which is the subject of the case at bar. When respondent determined that she would issue "no change" reports on those cases involving the Arbutus wind turbines, the Appeals Officer, Mr. Kelley, sent to petitioner the following letter under date of April 21, 1992: For our records, I request that you sign two (2) additional copies, enclosed, of the Tax Court Decision Documents. As you will note, nothing has changed from the documents signed by you and returned to me on February 21, 1992.
Petitioner Leslie O'Sullivan signed a copy which was contained in the administrative file of this case. There is no evidence of any sort that petitioner Brian O'Sullivan signed a copy, and it is clear that *413 the decision document was not executed on behalf of respondent. No such stipulated decision document was sent to this Court for filing and entering. The decision document was not approved for execution by appeals officer Kelley's supervisor. Petitioners, however, contend that the holding of this Court in Haiduk v. Commissioner, T.C. Memo. 1990-506, compels a holding that this case has been settled. We do not agree. In Haiduk, respondent by letter extended an offer to petitioners who were investors in a national litigation project, with specific settlement terms. Taxpayers met the time frame and terms for acceptance of the offer. Respondent subsequently refused to proceed with the settlement since petitioners had enjoyed tax benefits from the project in years not before the Tax Court. We held that "An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court and even in the absence of a writing." In Haiduk, it was clear that respondent had made an offer to settle and petitioners had timely notified respondent of their acceptance of the offer. Such is not the case *414 here. Unlike Haiduk, there is nothing in the record to indicate that both sides had ever agreed to anything. The decision document was not signed either on behalf of respondent or by petitioner. The case at bar, unlike those cited by petitioners, does not represent the situation where an agreement had been reached and one or the other side attempted to "back-out" of it. Here the agreement had not been reached. We hold that respondent, having never entered into a binding agreement to settle this case, is not so bound. Business Bad Debt Loss. We turn now to the substantive issue. First, we will give some background about petitioner Brian O'Sullivan. Petitioner received an undergraduate degree from Stanford University and a law degree from the University of Toronto in 1976. After spending the required year articling, petitioner practiced law in Vancouver, British Columbia, from 19.77 to 1981. Sometime during the summer of 1980, petitioner became quite interested in various aspects of real estate development, mainly in the southern area of British Columbia. He considered several potential developments, and finally put together a project which became known as the Barclay *415 Street project. It was petitioner's hope to enter into a joint venture agreement with an experienced developer in which petitioner would be a partner in a building project. It was also petitioner's intention to leave the practice of law. After discussions with several developers, petitioners discussed the Barclay Street project with Mr. Earle, a principal of Markland properties, a real estate developer. Petitioner, who was intending to leave the practice of law, emphasized that it was incumbent for him to receive a "salary" while working on the project. The final partnership agreement entered into for the Barclay Street development was between Markland Properties Ltd. (hereafter Markland) and 220029 B.C. Ltd. 220029 B.C. Ltd. was a British Columbia corporation in which petitioner held all of the stock. Its name was subsequently changed to Coram Development Corp., and future references to Coram are to this corporation. The terms of the partnership agreement provided that each party would make an initial capital contribution of Can $ 150,000, and that Markland and Coram were each to hold 500 units of the partnership. The agreement further provided that capital accounts were *416 to be set up for each partner and that no partner had a right to withdraw amounts. However, the agreement also provided that distributions might be made from time to time to the partners, and that such amounts were to be charged to their capital accounts. Although the partnership agreement does not so explicitly provide, it was agreed with Markland that Coram would receive Can $ 5,000 per month. Petitioner withdrew from his law firm and no longer engaged in the practice of law. Rather, he devoted his full time and attention to the development of Barclay. It was petitioner's expectation that it would take about 2 years to fully develop and sell the Barclay Street project. The plan was to build luxury condominiums on the property. In arriving at his agreement with Markland, petitioner emphasized that a necessary element of the deal was that he receive a monthly draw so that he would have funds for living expenses. Both parties to the agreement understood that the Can $ 5,000 was critical to petitioner. The Can $ 5,000 payments were made to Coram, however, rather than to petitioner. Further, the monthly payments were, in accordance with the partnership agreement, subtracted *417 from Coram's capital account on the books of the partnership. As of September 30, 1981, Coram received Can $ 25,000 from the project; of this amount Coram expended Can $ 22,621.44 on expenses, for a net profit of $ 2,378.56. Petitioner reported receiving Can $ 2,500 from Coram on his 1981 Federal and British Columbia Individual Income Tax Return. In order to make the initial capital contribution, petitioner caused Coram to borrow Can $ 50,000 from Straight Forward Productions Inc., and the same amount from Richard F. Nicholls and Rita Nicholls, both borrowings supported by promissory notes and by petitioner's personal guarantee. The remaining amount of Can $ 50,000 can from petitioner. The partnership acquired the necessary funds for the real estate through a mortgage with Yorkshire Trust Company (hereafter Yorkshire) in the amount of $ 1,000,000. Yorkshire demanded, and received, the personal guarantees of Mr. Earle of Markland and petitioner. In addition to a variable interest rate, Yorkshire was to receive one-third of the profit from the project as an interest bonus. The overall management, control, administration, and operation of the business was vested in Markland. *418 It was the plan, however, that petitioner should work full-time on the preconstruction stages of the project, such as obtaining necessary licenses, zoning requirements, use permits, meeting with architects and contractors, and so forth. In any event, an experienced employee of Markland worked with petitioner on these matters. Before the project got off the ground, however, financial considerations forced a change of plans. Interest rates had gone up to 21 percent, Markland was paying 3 percent over prime on its borrowings, and Mr. Roger Earle, principal of Markland, decided in June of 1981 not to proceed further with the development. As a result, petitioner no longer received the monthly Can $ 5,000 draw, and as he termed it "it was a disaster". Petitioner was out of work with no income prospects. He subsequently went to work for another real estate development group, Strand Properties, and he made $ 22,500 during the balance of 1981 working on Strand's projects. As a direct result of working for Strand, petitioner developed some ideas which he believed might serve to recoup the Barclay project. He brought to Markland the suggestion that they might turn the project into residential *419 rentals for which there were potentially available some British Columbia subsidies. These projects were called Multiple Unit Residential Building projects (MURB). To become eligible for Province support, it was necessary that footings be poured on the land prior to the end of 1982. The plan was to sell limited partnership interests in the project, and once financing for the MURB was obtained, petitioner would once again receive his monthly Can $ 5,000 draw. Markland was agreeable to entering into a limited partnership agreement with Coram, but this time required that petitioner personally guarantee Coram's obligations. The agreement was entered into on March 26, 1982. The limited partnership, however, was unable to obtain the necessary financing. Sometime in April of 1982 Yorkshire Trust commenced foreclosure proceedings against the real property. Financial statements for the Barclay Street project, to December 31, 1982, indicate a total loss on the project of Can $ 1,042,007.33. Coram's share of the loss was Can $ 521,003.67, less a development profit of $ 100,000, [3] for a net loss of Can $ 421,003.67. Petitioner was liable for this amount, under his various guarantees, *420 as well as Can $ 50,000 to Richard and Rita Nicholls and Can $ 50,000 to Straight Forward Productions. Petitioner borrowed $ 160,000 from Arbutus, a company of which he was president, in January of 1984. Petitioner executed a demand promissory note in favor of Arbutus. Arbutus wired funds representing the $ 160,000 to the respective creditors. Thus, the amount of $ 80,030 was credited to Markland by Arbutus, as well as $ 40,170 to Courtney Smith, and $ 40,085 to Richard Nicholls. The debt which petitioner owed to Arbutus was "forgiven" by Arbutus, apparently through a redemption of petitioner's shares in Arbutus in 1985. Petitioner claimed on his 1984 return that he had a business bad debt loss in the amount of $ 160,000 for 1984. Respondent contends that the loss is a capital loss, *421 and allowed a deduction of $ 3,000. During 1981, petitioner's trade or business was that of being an employee of Coram. Petitioner realized only Can $ 2,500 during that year from Coram; the balance of his earned income came from his law firm, DeBou & Company, or from the work he did from Strand. His total earned income from employment for the year was Can $ 30,000, and this was the amount petitioner reported to Canadian taxing authorities. Coram became insolvent in 1982. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 166(a)(1) provides the general rule that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. However, in case of a taxpayer other than a corporation, section 166(a)(1) is not applicable to a nonbusiness debt. Sec. 166(d)(1)(A). Section 1.166-5(b)(1), Income Tax Regs., provides that a nonbusiness debt is any debt other than (1) a debt which is created, or acquired, in the course of the trade or business of the taxpayer, determined without regard to the relationship of the debt to a trade *422 or business of the taxpayer as of the time the debt becomes worthless, or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Our inquiry, then, is to determine whether the guarantees on which petitioner made payment were proximately related to his trade or business as of the time he entered into the guarantees in 1981 and 1982. See Weber v. Commissioner, T.C. Memo. 1994-341. In both 1981 and 1982, petitioner was an employee of Coram, and his trade or business was that of being an employee. Petitioner, accordingly, must prove that his dominant motivation in entering into the guarantees of the two Can $ 50,000 notes in 1981 was to protect his salary as an employee of Coram, but that entity at the most paid petitioner only Can $ 2,500 during that year. We find that petitioner's dominant motivation was not to protect his salary from Coram, but rather to increase his potential for profit through his ownership of the Coram shares. As stated in United States v. Generes, 405 U.S. 93, 103 (1972): "in determining whether a bad debt has a 'proximate' relation to the taxpayer's *423 trade or business, as the Regulations specify, and thus qualifies as a business bad debt, the proper measure is that of dominant motivation, and that only significant motivation is not sufficient." Throughout the course of the trial, petitioner referred to the Can $ 5,000 monthly payments which Coram was to receive as his salary, and on brief petitioner continues with such terminology. This Court is not bound by petitioner's self-serving classification of the payments. See, e.g., Tokarski v. Commissioner, 87 T.C. 74 (1986). The record is quite clear that Coram was taking withdrawals of capital of Can $ 5,000 per month, and neither Coram nor petitioner were receiving any such sums as salary. In 1981, petitioner contributed Can $ 50,000 of his own funds to Coram and indebted himself on guarantees in the amount of Can $ 100,000. As we stated in Garner v. Commissioner, T.C. Memo. 1991-569, affd. 987 F.2d 267 (5th Cir. 1993), "the larger the taxpayer's investment, the smaller his salary, and the larger his other sources of gross income, the more likely are the courts to find a dominant nonbusiness *424 motive for the guaranty." Further, the Supreme Court in Whipple v. Commissioner, 373 U.S. 193, 202 (1963), stated that: "Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged." Here, as in Whiple, the business activity was that of the corporation, not the petitioner. Petitioner's testimony, coupled with that of Mr. Earle, the principal of Markland, shows that the anticipated profits of the Barclay Street project might result in excess of a half-million Canadian dollars to both petitioner and Markland. Their hope was to sell the project at a substantial profit. While the expectations might have been overly optimistic, we find that it was petitioner's hope of realizing such profit from his capital investment of Coram that was his dominant motivation for entering into the guarantees. Petitioner in 1982, in his hope of saving his investment, undertook additional guarantees to Markland. Here, too, his testimony was that he did so in order to obtain the so-called "salary". The 1982 agreement, however, nowhere provides for payment of any salary to petitioner, *425 and in fact petitioner did not receive any salary from either Coram or Markland. We find that petitioner's dominant motivation in entering into the guarantees in both 1981 and 1982, was not to protect any salary he might have received as an employee of Coram. Accordingly, the payments made in 1984 on the various guarantees do not represent business bad debt losses. Because of our holding in this regard, it is unnecessary to consider respondent's alternative arguments. Timeliness of Petitioner's 1984 Return. Respondent contends that the 1984 Federal income tax return was not timely filed, even though petitioners filed a request for an extension to October 15, 1985, within which to file the return. When petitioners filed the extension request, they did not include any payments and estimated on the extension request that their additional tax liability was zero. Respondent bases her position upon Rev. Rul. 79-113, 1979-1 C.B. 389, which in effect holds that a failure to make a reasonable effort to estimate income on an extension request serves to make the extension request invalid. Petitioners sought accounting advice in connection *426 with their 1984 Federal income tax return from the firm of Ernst & Whinney, and we believe that they fully apprised that firm of all relevant facts. Petitioners relied upon the advice given. We further note that both petitioners were citizens of Canada when they sought such advice about U.S. tax laws. The fact that we have come to a substantive conclusion about the bad debt issue different from that of petitioners does not in itself indicate that petitioners filed their extension request with a lack of due care or reasonable cause. We find that petitioners made a bona fide and reasonable estimate of their tax liability based on the information available to them when they requested the extension. See Crocker v. Commissioner, 92 T.C. 899, 908-909 (1989). Accordingly, petitioners are not liable for the addition to tax for failure to file timely. Negligence. Respondent determined that petitioners are liable for an addition to tax for negligence. Negligence under section 6653(a) means lack of due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). *427 Petitioners contend that they are not liable for these additions to tax because they reasonably relied upon the advice of Ernst & Whinney regarding how to properly report the tax consequences of the 1984 payments on the guarantees. We have held that reasonable reliance on the advice of competent tax advisers fully informed as to the relevant facts may be sufficient to avoid the imposition of the addition to tax for negligence. Weis v. Commissioner, 94 T.C. 473, 487 (1990). We believe petitioners so reasonably relied on Ernst & Whinney, and we hold they are not liable for the addition to tax for negligence. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Section references are to the Internal Revenue Code in effect for the year at issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency.↩
2. The parties entered into a Stipulation of Settlement of tax shelter adjustments relating to the Arbutus Wind Turbines project. Respondent conceded all Arbutus issues, including that petitioners are not liable for additions pursuant to sec. 6659 and increased interest pursuant to sec. 6621(c).↩
3. Markland eventually developed the Barclay Street property as a cooperative housing project for the City of Vancouver, for which it received $ 200,000 of which one-half was credited to petitioner's account under the guarantees.↩